REVISED AUGUST 2, 2004

United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 19, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 02-40917

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUIS ENRIQUE INSAULGARAT,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before GARWOOD, HIGGINBOTHAM, and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Luis Enrique Insaulgarat appeals his conviction and sentence for possession of marihuana with intent to distribute. We affirm his conviction, but vacate his sentence and remand for resentencing.

**Facts and Proceedings Below**

On December 13, 2001, after a jury trial, the appellant Luis Enrique Insaulgarat (Insaulgarat) was found guilty of one count of possession with intent to distribute over 100 kilograms of marihuana. The offense was alleged to have been committed on or about August 21, 2001. On February 22, 2002, Insaulgarat was sentenced to 262 months' imprisonment, a five year term of supervised release, and a mandatory special assessment of $100.

The trial evidence reflected the following. Insaulgarat worked for LD Express, a Miami-based driver services business owned by Lorenzo D'Erbiti (D'Erbiti) that provides drivers for transporting various kinds of goods.[1] In August of 2001, Insaulgarat drove an empty trailer from Miami to Atlanta, where he picked up a load and transported it to Michigan. He then picked up another shipment in Michigan that was to be transported to Techno Trim, in care of Big Lake Transport in Laredo, Texas. According to personnel at Big Lake and the log book that Insaulgarat kept, the Techno Trim shipment arrived in Laredo on August 18, 2001. Insaulgarat then received instructions from D'Erbiti on the morning of August 20, 2001, that he was to transport a load of air conditioning equipment from Laser Forwarding, in Laredo, to Lennox Global Air Conditioning of Miami. This equipment was scheduled for delivery in Miami by 9:00 a.m. on August 22, 2001.

On the morning of August 20th, Insaulgarat took his now empty

---

[1] Insaulgarat is a Cuban citizen, legally in the United States as a political refugee.

2

tractor trailer to Laser Forwarding to be loaded.[2] The loading of the trailer lasted until approximately 7:00 p.m., at which time the Laser Forwarding employee who had been loading it took a picture of its contents and then put a metal seal on its rear. The seal number was recorded on the bill of lading, which Insaulgarat signed. Although Insaulgarat departed the Laser Forwarding warehouse at approximately 7:10 p.m. on August 20, 2001, he did not arrive at the Border Patrol checkpoint, located just north of Laredo, until nearly 24 hours later.

Insaulgarat arrived at the Border Patrol checkpoint outside Laredo at approximately 6:20 p.m. on August 21st. A canine alerted to the rear of the trailer, so Insaulgarat proceeded to secondary inspection. The Border Patrol agent instructed Insaulgarat to open the trailer, which the agent noticed did not have a seal on it. Upon entering the trailer, the agent discovered 60 bundles of marihuana, weighing approximately 981 pounds. The agent seized the marihuana, the bill of lading, a cellular telephone, and a log book from the vehicle, and turned these items over to the DEA. DEA agent Mike Rubalcaba (Rubalcaba) then interviewed Insaulgarat.[3]

---

[2] Initially, two trailers were requested to haul the air conditioning equipment to Lennox of Miami. However, after Insaulgarat arrived it was discovered that the merchandise would fit into one trailer. When the second trailer that had been ordered arrived at Laser Forwarding, about an hour after Insaulgarat, it was advised that it would not be needed.

[3] During this interview, Insaulgarat's cell phone rang repeatedly. When one of the agents answered it, a male voice on the other end asked who was speaking and then hung up.

At trial, Insaulgarat took the stand in his own defense. He testified that he did not actually arrive in Laredo on August 18, 2001, as his log book said, but rather on August 20, 2001, at 5:50 a.m., and that he was therefore late with the delivery of the cargo from Michigan because his tractor's engine kept overheating during the trip. He claimed that upon arriving in Laredo, he went directly to Big Lake, where his cargo was to be unloaded, and waited for the company to open at 7:00 a.m. Insaulgarat asked the person receiving the merchandise at Big Lake to write down that he had in fact arrived on August 18, so as to avoid the $100 fee that results from showing up late. In exchange for this favor, Insaulgarat claims he sold the Big Lake employee two locks at a discounted price.[4]

At 9:00 a.m. the morning of August 20, Insaulgarat claims that he received instructions to carry a load from Laredo to Miami. After arriving at Laser Forwarding to receive the cargo at 9:30 a.m., he slept in his cab until about 2:00 p.m. He then woke up, unhooked the tractor from the trailer, and drove the tractor to a local truck stop where he played video games, returning at

---

[4] Insaulgarat testified that he had to arrange his log book to meet his deadlines and conform with trucking regulations about driving time and resting periods. Therefore, he adjusted the log book to show that he arrived in Laredo on August 18, the deadline for the Michigan delivery, rather than August 20, when he actually arrived.

In the government's rebuttal case, the Big Lake employee testified that the arrival date was in fact August 18, and he denied that he had been asked to put down August 18 instead of August 20.

approximately 5:00 or 6:00 p.m.  After the trailer was loaded at 7:00 p.m., the seal was placed on the door.  Insaulgarat testified that it was possible to enter the trailer without breaking the seal.

Insaulgarat testified that he left Laser Forwarding around 7:00 p.m, went to a truck stop in Santa Maria where he showered and ate, and then took a taxi to Nuevo Laredo, Mexico.  There, he claims, he bought earrings for his daughter, saw a movie, and walked around.[5]  Insaulgarat returned to his tractor-trailer at 3:00 or 4:00 a.m. the following morning.  He claims that he could not leave until 7:00 p.m. the next day because he wanted the tractor to cool down and he needed to rest.[6]  He stayed in his cab and rested until 4:00 p.m., at which time he claims that he took the trailer to be washed and weighed.  He then proceeded to the checkpoint.  Insaulgarat testified that he noticed that the seal was still on the trailer when he returned from Nuevo Laredo early in the morning on August 21, and that he did not recheck the seal before proceeding to the checkpoint because he did not leave the

---

[5] This contradicted what Rubalcaba said that Insaulgarat told him during his post-arrest interview.  There, he claims, Insaulgarat said that while in Nuevo Laredo he went to Boys Town, an adult entertainment location, and did not return until 3:00 pm the following afternoon.

[6] In his brief, Insaulgarat also notes that he did not drive on the night of August 20, 2001, after loading up at Laser Forwarding, because he had traveled 3000 miles in a period of seven days, and had to rest for a period of twenty-four hours.

5

tractor-trailer alone after he had last checked it.

Insaulgarat's cell phone records indicated that he made and received a large number of calls to and from telephone numbers with Laredo area codes while he was en route to Laredo and while he was there. Furthermore, Insaulgarat stated that he had picked up a fellow trucker, Roberto, whose truck had broken down outside Atlanta, and who wanted to go to Laredo. Although Insaulgarat did not know at the time that he would be going to Laredo, Roberto accompanied him to Michigan, and then, serendipitously, to Laredo. Insaulgarat claims that he let Roberto use his cell phone to call his wife, daughter, and his company. Records from the phone company showed that a Laredo cell phone number registered to Rosalinda Gutierrez (Gutierrez) called Insaulgarat's cell phone multiple times, including around the time that he was at the checkpoint. Agents learned that Gutierrez had given the cell phone to Manuel Olvera (Olvera), but when they went to speak with Olvera, they discovered that he had moved out the day of Insaulgarat's arrest.

Other relevant facts will be noted in the discussion of the issues to which they pertain.

## Discussion

*I. Improper prosecutorial comments*

Insaulgarat argues that the prosecutor made improper remarks and asked improper questions that denied him a fair trial. He first claims that prosecutorial misconduct occurred when the

6

Assistant U.S. Attorney (AUSA) elicited testimony from Agent Rubalcaba that Gutierrez came to court on the first day of trial pursuant to a trial subpoena, but had an attorney with her and declined to make a statement. Insaulgarat next claims error because of the AUSA's comment to him during his cross examination that he could be better understood if he told the truth.

*A. Standard of Review*

In reviewing a claim of prosecutorial misconduct, this Court applies a two-step analysis. *United States v. Lankford*, 196 F.3d 563, 574 (5th Cir. 1999). We must first decide whether or not the prosecutor "made an improper remark." *United States v. Munoz*, 150 F.3d 401, 414 (5th Cir. 1998). In determining whether a prosecutor's comment was improper, it is necessary to look at the comment in context. *United States v. Washington*, 44 F.3d 1271, 1278 (5th Cir. 1995). If an improper remark was made, we must then determine whether the remark "prejudiced the defendant's substantive rights." *Munoz*, 150 F.3d at 415. The prejudice determination involves "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt." *United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir. 1995). "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989).

7

*B. Comments*

*1. Elicitation of Rubalcaba's testimony about Rosalinda Gutierrez*

At trial, DEA Agent Rubalcaba testified on redirect examination by the AUSA that Gutierrez was subpoenaed for Insaulgarat's trial, and that she arrived on the first day of trial. However, Rubalcaba could not ask Gutierrez anything at that time because "she refused to talk" and had a lawyer with her.[7] Insaulgarat claims that the government impermissibly created an inference that Gutierrez was guilty by introducing evidence that

---

[7] During the government's redirect examination of Rubalcaba, the following exchange took place:

[Prosecutor]: Well, first of all, did you make any attempts to go locate Rosalinda Gutierrez?
[Witness]: Yes.
[Prosecutor]: And were you able to interview her?
[Witness]: Yes.
[Prosecutor]: And did you serve or try to serve or serve a subpoena on her?
[Witness]: Yes. . . . She showed up here yesterday.
[Prosecutor]: Okay. And did you ask Rosalinda Gutierrez anything else after she showed up?
[Defense]: Objection, Your Honor. That might be hearsay.
[Court]: No. That's as far as did you ask her anything else? Yes or no.
[Witness]: After she showed up here?
[Prosecutor]: Yes.
[Witness]: No.
[Prosecutor]: Why not?
[Witness]: She refused to talk.
[Prosecutor]: Why not? Was there anybody with her?
[Witness]: A lawyer.
[Defense]: Your Honor, objection. Your Honor, we make a motion for a mistrial.
[Prosecutor]: They've been asking questions as far as –
[Court]: No, that's overruled.

8

she refused to speak to Rubalcaba, and in turn, tainted Insaulgarat's credibility by making him appear guilty by association with her. Insaulgarat argues that this Court has made it clear that it is improper to elicit evidence that a defendant invoked his right to counsel and remained silent. He cites cases where this Court has criticized introduction of "guilt by association" evidence, has not allowed introduction of evidence of a co-conspirator's guilty plea, and has not allowed a prosecutor to call a witness to testify knowing that the witness would invoke the right not to testify. *See, e.g., United States v. Taylor*, 210 F.3d 311, 316-18 (5th Cir. 2000); *United States v. Leach*, 918 F.2d 464, 467 (5th Cir. 1990); *United States v. Brown*, 12 F.3d 52 (5th Cir. 1994).

In *Brown*, this Court held that a prosecutor cannot call a witness, knowing that the witness will invoke the right not to testify, when it is done to create an improper inference. The prosecution in *Brown* called the defendant's son (and her husband) to testify, knowing that they would invoke their rights not to testify. We held that "there [was] a reasonable probability that the jury inferred guilty knowledge on the part of both the defendant and the witness from [the son's] refusal to testify." *Id*. at 54. We continued, "[u]nder certain circumstances the forced invocation of a testimonial privilege in the presence of the jury will warrant reversal. . . . [such as] when the government makes a

9

'conscious and flagrant effort to build a case based on the unfavorable inferences which inure from a claim of the privilege' . . . . [or] when those inferences add critical weight to the government's case in a form that is not subject to cross-examination." *Id.* (citing *United States v. Watson*, 591 F.2d 1058, 1062 (5th Cir. 1979)[8]). In *Brown*, because the son and husband invoked the privilege and did not testify, the defense counsel did not have an opportunity to cross-examine them in order to dispel the adverse inferences that may have arisen from their silence. Similarly here, the Rubalcaba exchange took place on redirect, and because Gutierrez did not take the stand, there was no chance for the defense to question her.

While there are some underlying similarities, Insaulgarat's claim differs from those presented in *Brown* and *Watson*, because Gutierrez herself was never called to testify and therefore did not invoke her right to silence "in the presence of the jury," as did the son in *Brown*. 12 F.3d at 54. Rather, it was Agent Rubalcaba's testimony that referred to her refusal to speak with him. Moreover, unlike the prosecution in *Brown*, the record shows that the government in the case *sub judice* did not make a "conscious and

---

[8] In *Watson*, the court held that because there was no showing that the prosecutor knew that the witness would invoke the Fifth Amendment, there was no need for reversal. The prejudice was not great enough. However, in the case *sub judice*, the prosecutor had knowledge that Gutierrez had invoked the privilege, and therefore intentionally elicited the comment from Rubalcaba.

10

flagrant" effort to build a case based on inferences drawn from the fact that Gutierrez had a lawyer with her and would not speak to Rubalcaba. In fact, the prosecution did not bring out the fact that Gutierrez owned the cell phone at issue.[9] Rather, on cross examination of Rubalcaba and the cell phone representative, Insaulgarat's counsel raised the point that the phone was in fact owned by and registered to Gutierrez, that she previously had stated she lost it and disconnected it, and that the phone records did not actually reveal who placed a call from the phone, just to whom it was registered. The defense counsel then offered into evidence Insaulgarat's cell phone records.

The line of questioning to which Insaulgarat objects came about during the redirect of Rubalcaba, apparently *only* to show that the government was not trying to hide Gutierrez. During the prosecution's closing argument, while the AUSA did address Olvera's use of the phone and his disappearance soon after Insaulgarat's arrest, no attention was called to Gutierrez or to the fact that she refused to speak to Rubalcaba or had a lawyer. Clearly, the government's case was not to any extent based on, let alone built

---

[9] According to the cell phone records that were entered into evidence, Insaulgarat's cell phone had frequently received calls from a specified number in Laredo. It was established that this number belonged to a cell phone owned by Gutierrez. However, on direct examination the Voicestream Wireless representative did not discuss Gutierrez's ownership of the phone, and when discussing the calls from the cell phone in question, Rubalcaba stated on direct that the phone was being used by Olvera without mentioning Gutierrez.

around, any inferences drawn from the fact that Gutierrez would not speak to Rubalcaba (or had a lawyer) or, indeed, any inferences at all about Gutierrez.

Moreover, even if we were to assume, *arguendo*, that the comment was improper, any potential for prejudice caused by the elicitation of the Gutierrez information was minor and limited, and Rubalcaba's testimony in that respect did not add any material weight to the government's case. Even if the jury inferred that Gutierrez knew the phone was being used for illegal purposes, there was no evidence or argument that Gutierrez and Insaulgarat had any association whatsoever. The prosecution's case in this respect focused only on the fact that Olvera used the phone, that there were multiple calls to the Laredo area, and that Insaulgarat claimed he had only been to Laredo on one prior occasion. There was no focus on Gutierrez. Additionally, even if her refusal to speak to Rubalcaba did infer knowledge of criminal activity, Insaulgarat's defense did not rely upon innocent use of Gutierrez's phone, but rather upon the claim that Insaulgarat's passenger made the calls to Laredo, or that his (Insaulgarat's) phone records had been falsified. There is simply no reasonable possibility that the verdict was influenced or affected by the complained of evidence concerning Gutierrez.

We hold that the prosecution's introduction of evidence about Gutierrez's having a lawyer and refusing to speak to Rubalcaba does

12

not constitute reversible error.

> *2.      AUSA's comment during cross examination of Insaulgarat that he could be better understood if he told the truth.*

Insaulgarat took the stand in his own defense, claiming that he was innocent of any wrongdoing related to the charge. During his cross examination, the prosecution questioned Insaulgarat about the cell phone documents and calls. Insaulgarat refused to answer questions about the Laredo cell phone numbers and merely asserted, without explanation or evidentiary support, that the phone records were falsified by the phone company. The AUSA then asked him whether he was saying that the phone company made up the calls to and from Laredo but not the calls to his house. Insaulgarat replied by stating, "I'm going to tell you something, and it's just maybe it's a way of you understanding me better – excuse me, but this is my defense. I'm innocent." The prosecutor replied by stating, "We would really understand you better if you told us the truth."

After the prosecutor made this comment, Insaulgarat's defense counsel objected and made a motion for mistrial. The court responded by stating that the prosecutor's comment "will be stricken," but overruled the motion for mistrial. The court instructed Insaulgarat to simply answer the questions posed by the prosecutor. Both during the course of the trial and in its

13

instructions to the jury, the court informed the jury that statements by the lawyers are not evidence, and instructed the jury to disregard anything stricken from the record. Insaulgarat, however, claims that the AUSA's comment deprived him of a fair trial because his defense relied heavily on his credibility, and this comment might have led the jury to believe that the government had "extra-record knowledge" pertaining to Insaulgarat's veracity.

It is arguable that this remark constituted improper cross-examination. *Cf. United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1238 (5th Cir. 1990) ("even the most inexperienced prosecutor should be aware that it is improper and highly inappropriate to interject his or her personal opinion of the defendant's veracity into the decision-making process"). However, the AUSA's comment here was a direct response to Insaulgarat's comment, which was an attempt at avoiding the AUSA's prior question. *See Washington*, 44 F.3d at 1278 (looking at the prosecutor's comments in context to determine whether they were improper). In context, the AUSA's one brief spontaneous remark is most reasonably understood as referring not to matters not in evidence but only to the facial implausibility of Insaulgarat's bizarre testimony about the phone records. Because the judge did promptly strike the comment from the record, and nothing like it was mentioned again during trial or closing arguments, Insaulgarat has not shown that it "cast serious doubt on the correctness of the jury's verdict." *Iredia*, 866 F.2d

14

at 117.[10]  Indeed, considering the record as a whole there is no reasonable possibility that the remark by the AUSA influenced or affected the verdict.

## II.  *Admissibility of the Border Patrol agent's report*

At trial, during cross examination of Border Patrol Agent Jose Ramos (Ramos), the defense sought to introduce into evidence a report prepared by Ramos, who had searched Insaulgarat's trailer at the checkpoint.[11]  Insaulgarat wanted to use the report to establish that he denied knowledge of the presence of the marihuana at the time of his arrest.

### A.  *Standard of Review*

A district court's decision concerning the admission of evidence is generally reviewed for abuse of discretion.  *United States v. Cantu*, 167 F.3d 198, 203 (5th Cir. 1999).  A district court abuses its discretion if it bases its decision on an error of

---

[10] We recognize the appellant's argument that this Court has found that merely sustaining an objection and striking the objectionable prosecutorial comment is not always sufficient to remove the taint of the objectionable comment.  *See United States v. Labarbera*, 581 F.2d 107, 109 (5th Cir. 1978).  However, in that case, the prosecutor made more than one improper comment about evidence outside the record, such as the fact that the defendant was involved in other criminal misconduct, and that the prosecutor had knowledge of evidence which was not before the jury and which showed guilt of the crime at issue.  The taint in that case was much more severe and plain than that in the case *sub judice*.  Here, the jury instruction was clearly enough to remove any taint.

[11] The portion of the report at issue indicated that "[a]fter [Insaulgarat] was advised of his rights, he claimed he did not know the marijuana was inside the trailer."

15

law or a clearly erroneous assessment of the evidence. *United States v. Mann*, 161 F.3d 840, 860 (5th Cir. 1998), *cert. denied*, 526 U.S. 1117 (1999). If the district court erred in its evidentiary ruling, this Court must then decide whether the error was harmless. *Cantu*, 167 F.3d at 203. In determining whether the error was harmless, this Court considers the importance of the evidence to the prosecution's case, whether it was cumulative, whether it is corroborated or contradicted by other evidence on material points, the extent of cross-examination, and the overall strength of the prosecution's case. *United States v. Edwards*, 303 F.3d 606, 623 (5th Cir. 2002).

   *B. At Trial*

   On direct, Agent Ramos testified to the discovery of marihuana in the trailer, but he did not testify to anything the defendant said or did not say after the marihuana was discovered, nor did he testify as to any report he prepared. On cross examination, the defense attempted to ask Agent Ramos what the defendant had said at the time of his arrest when he was asked whether he knew his trailer had marihuana in it. However, the court sustained the government's hearsay objection, and did not allow the agent to testify as to what Insaulgarat's response was.[12] Defense counsel

---

[12] Insaulgarat does not appeal that ruling, or any other aspect of the cross examination, and instead relies only on the hearsay exception in its relation to the report. Regardless, the report, and anything Insaulgarat may have said to Ramos at the time of his arrest, was not addressed on direct, and the scope of

was permitted only to ask agent Ramos, "did you ask Mr. Insaulgarat if he knew that this trailer had marihuana in it, yes or no?" and Agent Ramos responded affirmatively. Defense counsel admitted that he was not trying to impeach Ramos by asking these questions, because Ramos had not testified to his report or to what the defendant said or did not say. The court did not allow the report into evidence, and denied the defendant's proffer of the report outside the presence of the jury.

*C. Discussion*

Insaulgarat claims that the district court erred in excluding the border patrol report in violation of Federal Rule of Evidence 803(8)(B), the public records exception to the hearsay rule. However, the district court stated that in criminal cases the 803(8) exception does not apply to reports made by police and other officers, and therefore declined to admit the evidence and held that the report could only be admitted for impeachment purposes.

Though hearsay evidence is generally excluded, there is an exception for public records and reports. Federal Rule of Evidence 803(8) states that a hearsay exception exists for:

"Records, reports, statements, or data compilations, in

---

cross cannot exceed that of direct, so the court did not err in disallowing the Agent's response. *See U.S. v. Lowenberg,* 853 F.2d 295, 300 (5th Cir. 1988) ("Federal Rule of Evidence 611 makes clear that a trial judge is not required to permit cross-examination that exceeds the scope of the direct examination.").

any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel . . .*" Fed. R. Evid. 803(8) (emphasis added).

Appellant contends that the rule in fact only intended to prevent *prosecutors* from using police reports as evidence against criminal defendants.  Appellant cites 5 Weinstein's Federal Evid. § 803.10(5) at 803-102 (2003), and *United States v. Smith*, 521 F.2d 957, 968[-69 n. 24] (D.C. Cir. 1975) in support of his argument that most courts have concluded that Congress did not intend for these reports to be excluded when the defendant seeks to introduce them into evidence.  Therefore, Insaulgarat claims, the district court's ruling was an abuse of discretion and the error was not harmless because this report would have done much to bolster the credibility of his own version of the events "by showing that his protestations of innocence were not a fabrication for trial, but had been made from the outset of the case."

The plain language of the rule does not distinguish between a defendant's and a prosecutor's use of a police report.  In *United States v. Sharpe*, 193 F.3d 852, 868 (5th Cir. 1999), the defendant appealed the refusal to admit exculpatory FBI lab reports, but we applied the rule according to its terms, holding that "Rule 803(8)(B) excludes 'matters observed by police officers and other law enforcement personnel' in criminal cases."  There is, however,

18

substantial authority, such as *Smith*, supporting Insaulgarat's position. *Sharpe* has been criticized, see 4 Saltzburg, Martin & Capra, Federal Rules of Evidence Manual, § 803.03[8][*1*][iii], at 803-197 (LexisNexis 8th ed. 2002), but we are bound by the decisions of Fifth Circuit panels. Furthermore, even assuming, *arguendo*, that the district court did err by excluding this report, any error was clearly harmless.

Though Insaulgarat claims that the report would have bolstered his credibility, the evidence contained in the report was ultimately presented to the jury, though via another source: At trial, Insaulgarat himself testified that at the time of his arrest, he told the federal agents at the checkpoint that he had no knowledge of the marihuana in his trailer. Additionally, Agent Rubalcaba's testimony about what Insaulgarat told the agents at the checkpoint mentioned nothing about Insaulgarat's knowledge of the marihuana; it is highly likely the jury would realize that if Insaulgarat had admitted knowledge of the marihuana at the time of his arrest, the agents would have testified to that effect. The purpose that the report would have served was in fact established by other trial evidence, making it cumulative. Notably, there was no evidence, nor did the government ever contend, to the contrary. Therefore, the court's failure to admit the report did not likely

affect the outcome of the trial.[13]

*III.  A conviction under the Florida Aggravated Stalking statute is not a "crime of violence."*

Though Insaulgarat did not raise the objection in the district court, he argues that he was erroneously sentenced as a career offender because his 1993 Florida conviction for aggravated stalking should not be considered a crime of violence under U.S.S.G. § 4B1.2(a).  We agree.

*A.  Standard of Review*

Interpreting a guideline such as the career offender provision in section 4B1.1 is a question of law generally subject to a *de novo* review.  *United States v. Charles*, 301 F.3d 309, 312–13 (5th Cir. 2002) (en banc).  However, where a defendant fails to object below, this Court reviews for plain error.  *United States v. Meshack*, 225 F.3d 556, 575 (5th Cir. 2000).  To establish plain error, a defendant must show the following: (1) there is an error; (2) that is clear or plain; (3) that affects the defendant's substantial rights; and (4) that seriously affects the fairness,

---

[13] Insaulgarat does not argue on appeal that the refusal to admit the report wrongfully forced him to take the stand, though he did make this argument at trial.  Accordingly, any such claim has been abandoned.  In any event, such claim would be merely theoretical because the jury would have no reason to assume that Insaulgarat had admitted (or had not denied) his guilt because, were that the case, the agents would obviously have so testified.  Moreover, with so much evidence against Insaulgarat, he effectively had to take the stand if he wanted to stand a chance of acquittal.

integrity or public reputation of judicial proceedings. *Id.*

B. *Discussion*

Under section 4B1.1 of the Sentencing Guidelines, a defendant may be sentenced as a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction, (2) the offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. Insaulgarat was over eighteen, the instant conviction is a felony controlled substance offense, and Insaulgarat has two prior felony convictions, one of which was undisputably for a crime of violence. At issue is whether his only other prior felony conviction, namely his aggravated stalking conviction under Florida Statute section 784.048(4), qualifies as a "crime of violence." Because we hold that it does not, it was error to have sentenced Insaulgarat as a career offender.

For these purposes, a "crime of violence" is any offense under federal or state law that is punishable by imprisonment for a term exceeding one year and "(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

21

U.S.S.G. § 4B1.2(a). Furthermore, Application Note 1 to this section advises that a

> "'crime of violence' includes murder, manslaughter, kidnaping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling. Other offenses are included as 'crimes of violence' if (A) that offense has as an element the use, attempted use, or threatened use of physical force against the person of another, or (B) the conduct set forth (i.e., expressly charged) in the count of which the defendant was convicted involved use of explosives (including any explosive material or destructive device) or, by its nature, presented a serious potential risk of physical injury to another."
> § 4B1.2 comment. (n.1).

*See generally U.S. v. Huerta*, 182 F.3d 361, 364 (5th Cir. 1999) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

If the prior conviction is not one of the enumerated offenses, and does not have use (or threatened or attempted use) of force as an element, a categorical approach is taken to determine whether the charged count of conviction, by its nature, presented a serious potential risk of physical injury. *United States v. Serna*, 309 F.3d 859, 862 (5th Cir. 2002). Specifically, this Court has held that under section 4B1.2(a)(2), an offense should only be considered a crime of violence if, from the face of the indictment, the crime that was charged presents a serious potential risk of physical injury. *See, e.g., United States v. Lee*, 310 F.3d 787,

790-91 (5th Cir. 2002); *United States v. Charles*, 301 F.3d 309, 314 (5th Cir. 2002) (en banc). Physical injury need not in fact result, but the indictment must make it clear that the crime charged in fact posed the risk. *Lee*, 310 F.3d at 790-91. "If an indictment is silent as to the offender's actual conduct, we must proceed under the assumption that his conduct constituted the least culpable act satisfying the count of conviction." *U.S. v. Houston*, 364 F.3d 243, 246 (5th Cir. 2004); *see also Serna*, 309 F.3d at 863.

According to the pre-sentence investigation report (PSR), Insaulgarat was arrested in Florida in 1993 and charged with aggravated stalking, armed burglary, sexual battery, and kidnaping.[14] At the time of this arrest, Insaulgarat already had an injunction against him for domestic violence against a woman (SN). In November of 1993, a jury found Insaulgarat guilty of aggravated stalking and misdemeanor battery, a lesser included

_____

[14] The PSR, based upon certain investigative reports, indicates that the incident that led to his aggravated stalking arrest began with Insaulgarat hiding in some bushes outside of SN's home. When she arrived home and was opening the door, Insaulgarat approached her, placed a pocket knife to her throat, covered her mouth, and told her not to make any noise. He then pushed her into the residence, locked the door, tore off her clothes and sexually assaulted her. We need not, however, look to the facts assertedly underlying the stalking offense to determine whether it is a crime of violence; rather, for purposes of § 4B1.2(a) we look only to the fact of conviction and the statutory definition of the prior offense, and, in appropriate cases, the indictment. *United States v. Rodriguez-Rodriguez*, 323 F.3d 317, 318-19 (5th Cir. 2003) (per curiam).

offense, and he was sentenced to three years in prison.[15]  Then, in

May of 1995, Insaulgarat was arrested and convicted of aggravated

assault with a firearm and false imprisonment.[16]

It is undisputed that Insaulgarat had at least one prior

conviction which was a crime of violence (the 1995 aggravated

assault).  Therefore, the focus is now on whether the aggravated

stalking conviction was also *clearly*[17] *not* a crime of violence.  The

aforementioned facts as set forth in the PSR indicate that the

---

[15] In  Florida in 1993, a person has committed misdemeanor battery if he "(a) [a]ctually and intentionally touches or strikes another person against the will of the other; or (b) [i]ntentionally causes bodily harm to an individual." Fla. Stat. Ann. § 784.03 (1993).  This misdemeanor battery charge cannot satisfy the definition of a crime of violence, and the original indictment for sexual battery was not charged in the count of conviction.  To qualify as a career offender, a defendant must have had at least two prior *felony* convictions of either a crime of violence or a controlled substance offense. Therefore, Insaulgarat's misdemeanor battery conviction does not qualify under the career offender consideration.

[16] This qualifies as Insaulgarat's uncontested prior felony crime of violence conviction for purposes of the career offender sentence, and was unrelated to the domestic violence injunction.

[17] As the issue was not raised below, we apply the plain error standard.  Because Insaulgarat was sentenced as a career offender, the guideline range for the offense of conviction was 262-327 months.  He was sentenced to 262 months, the bottom of the range.  However, if aggravated stalking is not a crime of violence for these purposes, and accordingly Insaulgarat is not a career offender, the range would be from 97-121 months.  Because the sentence imposed upon Insaulgarat is more than twice what it would be if the aggravated stalking offense were not a crime of violence, Insaulgarat has clearly presented an error that affects his substantial rights and the fairness of judicial proceedings. Therefore, we are left to determine whether the error here was clear.

aggravated stalking offense did indeed involve physical injury. However, pursuant to section 4B1.2(a), the question here is whether the Florida statute for aggravated stalking requires the use, or threatened or attempted use, of force, or whether the conduct alleged in the indictment presents a serious potential risk of physical injury.

The Florida aggravated stalking statute prohibits:

> "*Any person who*, *after* an injunction for protection against repeat violence pursuant to § 784.046, or an *injunction for protection against domestic violence, pursuant to § 741.30*, or after any other court-imposed prohibition of conduct toward the subject person or that person's property, *knowingly, willfully, maliciously, and repeatedly follows or harasses another person commits the offense of aggravated stalking*, a felony of the third degree . . ." Fla. Stat. Ann. § 784.048(4) (1993) (emphasis added).

Florida courts have interpreted this statute such that the elements of aggravated stalking are "knowledge of an injunction and knowingly, willfully, maliciously, and repeatedly following or harassing the beneficiary of the injunction." *See State v. Johnson*, 676 So.2d 408, 411 (Fla. 1996). In Florida, harassment is defined as "engag[ing] in a course of conduct directed at a specific person that causes substantial emotional distress in such person . . ." Fla. Stat. Ann. § 784.048(1)(a). On its face, the statute, and in turn the elements of the offense, do not require any use, or threatened or attempted use, of physical force.

We must therefore look to the indictment to determine whether the crime charged presents a serious potential risk of physical

25

injury to a person.  The term "domestic violence," as it is used in the Florida statute, is defined as "any assault, battery, sexual assault, sexual battery, or any criminal offense resulting in physical injury or death of one family or household member by another who is or was residing in the same single dwelling unit." § 741.30(1)(a) (1993).

Insaulgarat's indictment count for aggravated stalking stated:

> "LUIS ENRIQUE INSAULGARAT, *on or about JANUARY 31, 1993*, in the County and State aforesaid, *did unlawfully* and feloniously commit aggravated stalking upon [SN] *by knowingly, willfully, maliciously, and repeatedly following or harassing [SN] after the entry against the defendant of: AN INJUNCTION FOR PROTECTION AGAINST DOMESTIC VIOLENCE PURSUANT TO 741.30* Fla. Stat., in violation of 84.048(4) Fla. Stat., contrary to the form of the Statute in such cases made and provided, and against the peace and dignity of the State of Florida. (emphasis added).

In *United States v. Espinoza*, No. 02-51326 at 3-4 (5th Cir. May 8, 2003) (unpublished), this Court held that under plain error review, a conviction under Colorado's stalking statute was not a crime of violence under U.S.S.G. § 2L1.2.[18]  Although the Colorado statute was for stalking, not aggravated stalking, a person commits the Colorado offense if he "[r]epeatedly follows, approaches, contacts, places under surveillance, or makes any form of communication with another person . . . in a manner that would

---

[18] While § 2L1.2 uses the same definition for crime of violence as § 4B1.2(a), under § 4B1.2 a court may not only look to the elements of the crime, but also to the charged conduct in the indictment to determine if the conduct charged by its nature presented a serious potential risk of physical injury.

cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress." Colo. Rev. Stat. § 18-9-111(4)(b)(III) (2003). In that case the government had conceded that the defendant's stalking offense did not include an element that required proof of use, attempted use, or threatened use of physical force. Therefore, this Court determined that the defendant's stalking conviction did not meet the definition of a crime of violence.

It appears that the only other court to have addressed the issue of whether a stalking offense is a crime of violence is the Ninth Circuit.[19] In *United States v. Jones*, 231 F.3d 508, 519-20 (9th Cir. 2000), the court analyzed the California stalking statute, which states that "any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family, is guilty" of stalking. Cal. Penal Code § 646.9(a). In that case, the appellant argued that the element of "threat to safety" did not necessarily involve a threat of physical force as is required under section 4B1.2(a)(1). The district court disagreed, but after the defendant had been sentenced, the

---

[19] *But see U.S. v. Bassham*, 162 F.3d 1165 (table) (8th Cir. 1998) (Holding, in an unpublished, table opinion that the "district court correctly found that Bassham's earlier convictions for attempted burglary and stalking were crimes of violence for career offender sentencing under the guidelines.")

27

California Court of Appeal refused to interpret "safety" to mean physical safety only. Therefore, the Ninth Circuit vacated the sentence, because on its face the statute was not limited to physical injury, and therefore was not a crime of violence. *Jones*, 231 F.3d at 519-20.

A difference between Insaulgarat's aggravated stalking offense and those in *Jones* and *Espinoza* is that Insaulgarat's indictment specifically alleged that an injunction had been previously issued against him under the domestic violence law. Here, the crime for which Insaulgarat was convicted resulted from following or harassing the victim with the knowledge that there was an outstanding injunction against him for her protection. The *actus reus* of *this* crime was the following or harassing. The issuance of an injunction, even one for domestic violence, is a civil matter. Here, the face of the indictment does allege that SN was the beneficiary of the injunction against Insaulgarat and the victim of the aggravated stalking. However, to convict for aggravated stalking, the jury *in this case* only needed to find that an injunction to protect SN was outstanding against Insaulgarat, not that the victim was in fact ever threatened or in danger. So long as there was documentation that a judge in a civil case had previously entered such an injunction, that element of the crime of aggravated stalking was met. To convict for aggravated stalking, it does not matter whether that injunction had been properly

28

issued, and it does not matter whether the injunction was violated; it matters only that the injunction existed.

The government asserts that because an injunction for domestic violence had been previously issued, it necessarily follows that the person being stalked has a reasonable fear that he or she will be a victim, as he or she likely was before, and the stalking presents risk of harm to that person by its nature. However, there are forms of harassment that necessarily do *not* by their nature involve conduct that presents a serious risk of physical harm. For example, harassment could be mere repetitive phone calls or suicide threats, and when an indictment is silent as to the offender's actual conduct, as it is here, we proceed under the assumption that his conduct constituted the least culpable act satisfying the count of conviction.[20] *Houston*, 364 F.3d at 246. The existence of a previous injunction against domestic violence does not turn these acts of harassment into conduct that necessarily involves serious risk of injury.

Therefore, though we are permitted to look to the underlying charging document, it does not matter for our purposes here today

---

[20] Although we do in fact have information concerning the circumstances underlying the indictment in the case *sub judice*, because those circumstances are not alleged on the face of the indictment, and rather, the indictment merely tracks the language of the aggravated stalking statute, we must assume the least culpable conduct consistent with the wording of the statute and the indictment. In other words, we assume the least culpable conduct which the jury was required to find in order to convict under the statute and indictment.

29

whether the definition of "domestic violence" itself includes as a requirement the potential risk of physical injury, or whether SN was in fact a prior victim of domestic violence at the hands of Insaulgarat. On its face, the aggravated stalking statute can be violated without the use or threatened use of physical force, and the additional information provided in the aggravated stalking indictment about Insaulgarat's underlying injunction does not allege conduct which, by its nature, poses a serious potential risk of physical injury.

We hold that Insaulgarat's 1993 aggravated stalking conviction (which is not one of the named offenses in section 4B1.2) does not have as one of its elements the use, attempted use, or threatened use of physical force, and that the conduct set forth in the relevant count of the indictment by its nature does not involve a serious potential risk of physical injury to another. This conclusion clearly and plainly follows from the terms of section 4B1.2(a), the wording of the Florida statute and the indictment, and our jurisprudence construing section 4B1.2. Therefore, it was plain error to sentence Insaulgarat as a career offender, because he did not have two prior felony convictions of either a crime of violence or a controlled substance offense.

## Conclusion

For the foregoing reasons, Insaulgarat's conviction is affirmed but his sentence is vacated and the cause is remanded for

resentencing consistent herewith.

CONVICTION AFFIRMED;

SENTENCE VACATED, and cause

remanded for RESENTENCING.