IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 2, 2008

Charles R. Fulbruge III
Clerk

No. 04-20389

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE
COMPANY

        Plaintiff - Counter Defendant -
        Appellee - Cross-Appellant

v.

RES-CARE INC; ET AL

        Defendants

RES-CARE INC; TEXAS HOME MANAGEMENT INC

        Defendants - Counter Claimants -
        Appellants - Cross-Appellees

Appeals from the United States District Court
for the Southern District of Texas

Before REAVLEY, HIGGINBOTHAM, and GARZA, Circuit Judges.

REAVLEY, Circuit Judge:

We are confronted in this case with an insurance coverage and apportionment dispute in which both the insurer and the insured have appealed from the district court's judgment after a bench trial. The insurer, American International Specialty Lines Insurance Company, sued its insured, Res-Care, Inc., for breach of contract arising out of a non-waiver agreement that the parties executed in connection with the settlement of an underlying wrongful

death suit against Res-Care.  After American settled the underlying suit for $9 million, it sought reimbursement from Res-Care pursuant to the non-waiver agreement.  The district court conducted an allocation trial to apportion the settlement between covered and uncovered claims and entered judgment against Res-Care for $5 million.  We hold that Texas public policy bars punitive damages coverage in this case and AFFIRM the district court's judgment.

## I. Background

Res-Care and its subsidiary, Texas Home Management, Inc., (collectively "Res-Care") operate Appleridge, a group-home in Houston, Texas, that provides services for mentally disabled individuals.  From July 1, 1997, through July 1, 1998, American insured Res-Care through a Hospital Professional Liability and Commercial General Liability Policy (the "primary policy") and a Commercial Umbrella Policy (the "umbrella policy").  The primary policy provided coverage for, inter alia, damages due to bodily injury caused by an "occurrence," which was defined as "an accident, including continuous exposure to substantially the same general harmful conditions."  The primary policy had a coverage limit of $1 million.  The umbrella policy provided coverage for "loss in excess of the retained limit . . . which the insured shall become legally obligated to pay as compensatory damages" due to, inter alia, personal injury.  The umbrella policy had a limit of $15 million.  Both the primary and umbrella policies excluded from coverage damages arising from intentional acts.  The umbrella policy also excluded from coverage damages payable by the insured as punitive or exemplary damages.  Res-Care maintained similar annual primary and umbrella policies with American from July 1993 to July 1998.

From June 1, 1992, until her death on April 16, 1998, Trenia Wright, a 37-year old woman with cerebral palsy and mental disabilities, lived at Appleridge.  On the evening of Sunday, April 12, 1998, Wright fell in the hallway and defecated on the floor. Vickie Kennerly, an employee at Appleridge, poured a

mixture of undiluted bleach and another cleaner onto the floor and escorted other residents outside, leaving Wright inside the home. Wright was later found clad only in a T-shirt lying in the feces and the bleach, where she had been left for over one hour, and possibly for several hours, while Kennerly ate pizza outside. Although Wright apparently called for help, no one assisted her in getting up. Wright later told other residents that Kennerly had poured bleach directly onto her and had "set her on fire." When Kennerly eventually returned inside the house, she dragged Wright into the bathroom and cleaned the hallway floor, but she did not wash the bleach off of Wright. Kennerly left the facility soon afterward when her shift ended.

Two other staff members later found Wright on the floor in the bathroom and put her to bed in clean clothes. The staff put Vaseline on Wright, but they did not attempt to wash the bleach off of her. Although she had chemical burns on her legs, arms, stomach, and back, Wright received little medical care in the following days. She was not taken to the facility's doctor, Dr. Yalamanchili, until approximately 17 hours after the incident. Dr. Yalamanchili diagnosed Wright with only superficial burns. He prescribed pain medication and recommended whirlpool treatments, which were not provided. The pain medication was not given to Wright until almost 24 hours after she sustained the chemical burns.

A facility LVN examined Wright late in the afternoon on April 13, 1998, and was shocked by Wright's burns and surprised that the doctor had diagnosed only superficial wounds. A facility RN also saw Wright that day and observed the burns on Wright's arms. The RN did not fully assess Wright because Wright had been seen by the doctor and never followed-up on Wright's condition after April 13.

Wright's skin began peeling off in patches, and Wright began drinking a lot of water, a sign of dehydration from the chemical exposure. In the early morning hours of April 15, 1998, Wright fell out of bed and was found

unresponsive. She was taken to the emergency room and diagnosed with extensive chemical burns. On the morning of April 16, 1998, Wright died from complications due to the severe burns, which covered over 40% of her body. Kennerly was later convicted in state court of recklessly causing bodily injury to a disabled individual.

In June 1998, Wright's family filed a wrongful death and survival suit for compensatory and punitive damages against Res-Care, the hospital, the treating physicians, and four Res-Care employees, including Kennerly. American assumed the defense of Res-Care. In February 2000, the Wright plaintiffs demanded $16 million to settle the suit, and on February 25, 2000, American issued its first reservation of rights letter. The Wright plaintiffs settled their claims against the hospital and treating physicians for $1,085,000 in March 2000.

Over the next few months, Res-Care urged American to settle the claims against it, while American urged Res-Care to bear part of any settlement because it believed a settlement would necessarily include claims for uncovered punitive damages. In April 2000, the Wright plaintiffs filed their fourth amended complaint in which they asserted an additional allegation that Wright had suffered "ongoing neglect and abuse and sustained repeated personal injuries" since she first arrived at Appleridge in 1992, which prompted another reservation of rights letter from American.

On July 19, 2000, the Wright plaintiffs filed their ninth amended complaint against Res-Care in which they alleged a total of 75 claims for injuries that Wright allegedly suffered from 1993 to 1998. The additional injuries allegedly occurred on different specified dates and were distinct from the April 12, 1998 incident.

On August 1, 2000, American and Res-Care executed a separate non-waiver agreement that authorized American to seek a settlement of the Wright

suit. Prior to the execution of the agreement, American believed that coverage under its policies would be limited to Wright's actual damages, which it estimated would be no more than $2.5 million. It refused to make a settlement offer above that amount. The parties acknowledged in the non-waiver agreement that the Wright plaintiffs were seeking both compensatory and punitive damages and that American believed it was responsible under the policies for only actual damages, but that Res-Care believed American had had an opportunity to settle all claims within the available coverage limits. The parties agreed that if American was able to negotiate a settlement with the Wright plaintiffs, American "shall then have a right to proceed with a claim for recoupment from the Res-Care Defendants of all sums paid by [American] attributable to any claims not covered under the applicable Policies." Thereafter, American settled the Wright suit for $9 million and paid that sum to the Wright plaintiffs.

American then sought recovery in the district court for breach of contract under the non-waiver agreement. American contended that Res-Care breached the agreement by refusing to reimburse it for uncovered claims paid as part of the Wright settlement. The district court conducted a bench trial to apportion the settlement between covered and uncovered claims pursuant to Enserch Corporation v. Shand Morahan & Company, 952 F.2d 1485 (5th Cir. 1992).

American contended at trial that the actual damages in the Wright lawsuit were between $2 and $3.5 million, while Res-Care contended that the entire $9 million settlement represented actual damages. The district court determined that the portion of the settlement for the Wright plaintiffs' actual damages was $4 million and that punitive damages were $5 million. The district court determined that the entire $9 million was settlement of the claim for the April 12, 1998 bleach incident. The court held that the additional 74 claims first alleged on the eve of trial in the Wright plaintiffs' ninth amended complaint did

not substantially factor into the settlement. As punitive damages were not covered under the umbrella policy, the district court entered judgment for American for $5 million.

Res-Care has appealed the district court's judgment. American has filed a cross-appeal.

## II. Discussion

After a bench trial, we review legal conclusions and mixed questions of law and fact de novo.[1] We review evidentiary rulings for an abuse of discretion.[2]

### A. Evidence in the allocation trial

We begin with Res-Care's claims. It argues first that the district court erroneously considered evidence in the allocation trial that would not have been admissible during trial of the underlying wrongful death suit. Specifically, it challenges the district court's consideration of Kennerly's state-court conviction and the testimony of American's expert as to the reasonable settlement value of the Wright plaintiffs' actual damages. Res-Care asserts that the district court improperly found that American met its burden of proof in allocating the damages between covered and non-covered claims. We disagree with Res-Care's contentions.

In Texas, when there is a dispute as to coverage, an insurer faced with a settlement demand within the policy limits may fund the settlement of an underlying action and seek reimbursement from the insured "only if it obtains the insured's clear and unequivocal consent to the settlement and the insurer's right to seek reimbursement."[3] Here, Res-Care unequivocally consented to the settlement and agreed in the non-waiver agreement that American retained its

---

[1] In re Luhr Bros., Inc., 325 F.3d 681, 684 (5th Cir. 2003).

[2] Abner v. Kansas City S. R.R. Co., 513 F.3d 154, 168 (5th Cir. 2008).

[3] Texas Ass'n of Counties County Gov't Risk Mgmt. Pool v. Matagorda County, 52 S.W.3d 128, 135 (Tex. 2000).

right to seek reimbursement. The non-waiver agreement satisfied the conditions of Matagorda County and permitted American to seek reimbursement from Res-Care for uncovered claims that were included in the settlement with the Wright plaintiffs.

In a dispute between an insurer and its insured concerning an underlying settlement that may have included both covered and non-covered claims under the insurance policy, it is appropriate for the district court to make findings necessary to apportion the settlement between damages that the insurer owes and damages for which the insured has a duty to pay.[4] The district court's job is not to retry the underlying suit.[5]

In the allocation trial, the trier of fact "can consider any facts that could have been considered in the [underlying] lawsuit itself."[6] "The trial court, of course, will have considerable leeway in deciding what facts are truly relevant to the apportionment decision, and can thereby (we hope) prevent a full-blown retrial of the [underlying] lawsuit."[7]

Res-Care contends that Enserch necessarily limited the district court to considering only the evidence that would have been admissible in a trial of Wright's underlying wrongful death suit. We do not agree with such a narrow reading of our Enserch decision. Enserch recognized that the apportionment decision is a particularly difficult one, and it noted a lack of case law providing specific guidance on how to proceed.[8] In attempting to provide such guidance for district courts, we did not state that the district court would be limited to the

---

[4] Enserch, 952 F.2d at 1494.

[5] Id.

[6] Id. at 1495.

[7] Id.

[8] Id. at 1494–95.

evidence admissible in the underlying suit. Rather, Enserch gave district courts "considerable leeway" to decide what facts are relevant to the apportionment decision. The effect of this "leeway" is to expand, not contract, the district's discretion in considering apportionment evidence. As with all evidence, the key to apportionment evidence is whether it is "truly relevant."[9]

It is important to remember that the goal of the allocation trial is not to conduct a full blown retrial of the merits of the underlying plaintiff's claims, but rather to determine what portion of the settlement was reasonably intended to concern claims covered by the policy at issue.[10] The question is how the parties viewed the merits of the plaintiff's claims at the time of the settlement.[11] To determine a reasonable allocation from the viewpoint of the settling insurer (or insured), all information influencing the settlement decision is potentially relevant. This information might include internal memoranda, correspondence between the insurer and insured, communications with the injured party, investigative reports and statements, and even assessments of how sympathetic the plaintiffs would be at trial.[12] As noted above, the district court has considerable leeway in deciding the relevance issue.[13] Therefore, the district court was not limited here to consideration of the evidence admissible in the underlying wrongful death suit.

---

[9] Id. at 1495.

[10] See id.

[11] 1 ALLAN D. WINDT, INSURANCE CLAIMS AND DISPUTES § 6:31 (5th ed. 2008).

[12] See Am. Home Assurance Co. v. Libbey-Owens-Ford Co., 786 F.2d 22, 31 (1st Cir. 1986) (holding that "in any post facto analysis of settlement claims, if the district court is to make an allocation of the settlement amount, it should accept whatever evidence is available regarding the intent behind the settlement decision").

[13] Enserch, 952 F.2d at 1495.

With respect to the specific evidence challenged by Res-Care (Kennerly's conviction and the expert opinion on actual damages), we conclude that any error was harmless.[14] The district court found that Kennerly's conviction and the state appellate court's opinion affirming the conviction established the intentional nature of Kennerly's misconduct. Kennerly's state indictment charged her with "unlawfully" and "recklessly" causing serious bodily injury to a disabled individual, a violation of TEX. PENAL CODE § 22.04. The Texas Court of Appeals held that Kennerly's conduct was reckless by omission.[15] We agree with Res-Care that the mere fact of Kennerly's conviction for reckless conduct did not conclusively establish an intentional act under Texas law.[16] Although the court referred to Kennerly's conduct as intentional, however, the court found actual damages covered under the policies to be $4 million. After determining that the Wright plaintiffs' actual damages were reasonably $4 million, the court concluded that $5 million should be attributed to punitive damages. As discussed below, we cannot say that the court's determination was erroneous under the circumstances of this case.

We also agree that the opinion of American's expert as to the value of the Wright plaintiffs' actual damages had limited evidentiary weight.[17] Nevertheless, there is no showing that American's expert testimony as to the value of actual damages substantially affected the district court's decision. American's expert, Alice Oliver-Parrott, opined from a review of the evidence

---

[14] See FED. R. CIV. P. 61 ("the court must disregard all errors and defects that do not affect any party's substantial rights").

[15] Kennerly v. State, 40 S.W.3d 718, 721 (Tex. App. 2001).

[16] See State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 378 (Tex. 1993).

[17] See Utah Power & Light Co. v. Fed. Ins. Co., 724 F. Supp. 846, 850–51 (D. Utah 1989) (refusing to permit experts' evidence as to whether settlement included punitive damages where to do so would amount to a retrial of plaintiffs' case and a battle of the experts).

and her experience as a lawyer and former state judge that the Wright plaintiffs' actual damages had a reasonable settlement value of between $2 million and $3.5 million. The district court discounted Oliver-Parrott's opinion, however, because the court disagreed with her premise that Wright had no conscious pain and suffering and that Wright's surviving 9-year old son had no viable claim for loss of companionship. The district court attributed more of the settlement amount to covered actual damages than Oliver-Parrott. Therefore, we conclude that error, if indeed there was any, in admitting the expert's opinion was harmless.[18]

## B. Waiver and estoppel

Res-Care next argues that the district court erroneously precluded it from presenting evidence that the doctrines of waiver and estoppel barred American's defense of non-coverage. It contends that waiver and estoppel defeat American's non-coverage claim because American provided a defense without a reservation of rights for a year and a half.

Under Texas law, "the doctrines of waiver and estoppel cannot be used to create insurance coverage where none exists under the terms of the policy."[19] An exception to this general rule provides: "[I]f an insurer assumes an insured's defense without declaring a reservation of rights or obtaining a non-waiver agreement, and with knowledge of facts indicating non-coverage, all policy

---

[18] See Dresser-Rand Co. v. Virtual Automation, Inc., 361 F.3d 831, 842 (5th Cir. 2004) (holding that "this Court is bound to disregard any errors, including the admission of expert testimony, that do not affect the substantial rights of the parties"); Eiland v. Westinghouse Elec. Corp., 58 F.3d 176, 180 (5th Cir. 1995) (holding that "admission or exclusion of expert testimony is a matter left to the discretion of the trial court, and that decision will not be disturbed on appeal unless it is manifestly erroneous").

[19] State Farm Lloyds, Inc. v. Williams, 791 S.W.2d 542, 550 (Tex. App. 1990).

defenses, including those of non-coverage, are waived, or the insurer may be estopped from raising them."[20]

Res-Care asserts that the exception to the general rule applies in this case because, from the moment that American received the Wright lawsuit with the allegations of intentional misconduct, American had knowledge of facts indicating the existence of potentially non-covered claims, yet American failed to raise a coverage question for eighteen months. The problem with Res-Care's contention is that it contracted beyond such a defense by voluntarily executing the non-waiver agreement. That agreement specifically permitted American to seek reimbursement for non-covered claims. It provided that if American settled the Wright lawsuit and funded the settlement, "[t]he Res-Care Defendants agree that [American] shall then have a right to proceed with a claim for recoupment from the Res-Care Defendants of all sums paid by [American] attributable to any claims not covered under the applicable Policies." The only reasonable meaning of this provision is that Res-Care must reimburse American for any claims included in the settlement that are determined to be uncovered under the policies. Although Res-Care contends that its assent to the non-waiver agreement was "forced," we find no merit in this contention. Res-Care was represented at all times by competent coverage counsel and exercised a voluntary choice to execute the non-waiver agreement.[21]

### C. Multiple occurrences and multiple policies

---

[20] Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Kitty Hawk Airways, Inc., 964 F.2d 478, 481 (5th Cir. 1992) (internal quotation marks omitted) (emphasis in original).

[21] Res-Care complains that the district court initially denied both parties' motions for summary judgment on the waiver/collateral estoppel issue but then indicated at a pretrial conference that American's motion for summary judgment had been granted and that waiver and estoppel were no longer in the case. We find no inconsistency. The district court's written summary judgment order held that the waiver and estoppel issue was not in the case because Res-Care failed to show harm or prejudice. This is consistent with its remarks in the pretrial conference. We express no opinion on the court's finding because we conclude that the voluntary non-waiver agreement precludes Res-Care's reliance on waiver and estoppel.

Res-Care next argues that the district court failed to allocate damages between covered and non-covered claims occurring in multiple policy years. It contends that the $9 million settlement should have been allocated among all 75 injuries that Wright allegedly suffered, including those occurring on dates apart from the bleach incident on April 12, 1998. Specifically, Res-Care notes that the Wright plaintiffs alleged that Wright had fallen on dozens of occasions in 1996 and 1997. It contends that those "multiple occurrences" of negligence triggered coverage under the policies in effect for the years prior to 1998.

The district court concluded that despite the Wright plaintiffs' amendment to their complaint alleging additional injuries, any earlier policies were not available. The court reasoned that under Texas law insurance policies are not "stackable" due to multiple occurrences in multiple policy years. More importantly, however, the court determined that the Wright plaintiffs' allegations of injuries apart from the bleach incident did not substantially factor into the settlement. This finding is key, because under Enserch the purpose of the allocation trial was to determine the intent at settlement and the reasonable amount attributable to covered claims.[22]

Res-Care asserts that Eugene Boylan, vice-president of American's health care complex claims group, testified that the Wright plaintiffs' claims of additional negligence could trigger coverage under Res-Care's policies. Boylan testified that the claims "potentially" were covered, but he did not state that American definitively considered them to be covered claims. Rather, Boylan testified that the 74 additional claims were made in the plaintiffs' ninth amended complaint only two weeks before the $9 million settlement occurred, which was also only a few weeks before the scheduled start of trial. He specifically stated that the settlement did not result because of those claims.

---

[22] Enserch, 952 F.2d at 1495.

Furthermore, Res-Care's general counsel testified that in Res-Care's mind Wright's injuries on April 12, 1998, and her subsequent death were the most serious allegations in the complaint. Counsel testified that he did not evaluate the additional injuries and believed that many of the allegations might be false. He stated that he did not think they were relevant to the settlement.

Although the settlement agreement in the Wright suit necessarily released Res-Care from all the additional claims, the question in the allocation trial was whether any part of the settlement should be reasonably attributable to those claims. Based on our review of the record, we cannot conclude that the district court erred in finding that the additional, essentially last-minute, claims did not factor in the value of the settlement.[23] Therefore, the district court did not err by concluding that the only policies at issue were the primary and umbrella policies in effect on April 12, 1998.

## D. Punitive damages

Res-Care next argues that the district court erroneously failed to permit coverage of punitive damages under the multiple primary policies, which are silent as to such coverage. Because, as we concluded above, the district court correctly determined that multiple policy periods were not at issue, Res-Care's contention must be limited to the primary and excess umbrella policies in effect on April 12, 1998.

---

[23] Although, as Res-Care points out, American issued a reservation of rights letter after the Wright plaintiffs filed their fourth amended complaint in order to encompass any general claims of negligence alleged therein apart from the April 12, 1998 incident, we do not find the reservation of rights indicative of significant value in the specific claims of injuries alleged for the first time in the ninth amended complaint. All indications are that Res-Care and American were concerned mainly with the tragic circumstances of Wright's death. We also do not find persuasive Res-Care's argument that Alice Oliver-Parrott, American's expert, testified that the $9 million settlement included monies to settle all 75 injuries spanning from 1993 to 1998. Oliver-Parrott agreed only that claims for the additional injuries were released in the settlement; she believed the claims were alleged merely as inflammatory details added on the eve of trial. She expressly would not agree that the claims were viable, and we see no support in her testimony for the proposition that the claims represented value in the settlement.

The umbrella policy in effect on April 12, 1998, specifically excludes punitive damages from coverage. Thus, American could seek reimbursement from Res-Care under the non-waiver agreement for any part of the settlement attributable to punitive damages that were paid under the umbrella policy. The primary policy, however, which has a policy limit of $1 million, does not address coverage for punitive damages. Therefore, if punitive damages are covered under the primary policy, they would be limited to $1 million, and the amount of Res-Care's reimbursement to American might be reduced. The question is whether the primary policy covers punitive damages.

Res-Care asserted in its opening brief that Texas law permits an insured to recover punitive damages under the primary policy at issue here. After briefing and oral argument in this case, the Texas Supreme Court considered the issue of punitive damages and public policy in Fairfield Insurance Company v. Stephens Martin Paving, LP, 246 S.W.3d 653 (Tex. 2008). Although it expressly considered whether public policy precludes insurance coverage of punitive damages in the workers' compensation regime, the court also provided guidance for consideration of the issue in other contexts.[24] We subsequently requested supplemental briefing from the parties.

The Texas Supreme Court established a two-step process for courts to determine whether punitive damages are insurable. The court first asks whether the plain language of the policy covers the punitive damages in the underlying suit against the insured.[25] Second, if the court determines that the policy provides coverage, it determines whether Texas public policy allows or prohibits such coverage.[26] At the second step of the inquiry, the court looks to

---

[24] Id. at 660.

[25] Id. at 655.

[26] Id.

express statutory provisions to determine whether the legislature has made a policy decision; if the legislature has not made an explicit policy decision, the court will then consider general public policies.[27]

The primary Commercial General Liability policy in this case provides that the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies." The policy states that coverage applies for "bodily injury" that "is caused by an 'occurrence'" and that "occurs during the policy period." "Bodily injury" is defined as "bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time." The policy defines an "occurrence" to be "an accident, including continuous or repeated exposure to substantially the same harmful conditions." A policy exclusion states that the insurance does not apply to bodily injury that is "expected or intended from the standpoint of the insured."

American argues in its supplemental brief that punitive damages are precluded from coverage at step one of the Fairfield analysis—the plain language of the policy—because although the primary policy is silent as to punitive damages, the umbrella policy specifically excludes them from coverage and provides that excess coverage is not triggered unless the primary policy is first exhausted by payment of claims that would be covered under the umbrella policy. Since claims for punitive damages are excluded by the umbrella policy, American reasons, they may not be used to exhaust the primary policy, and therefore only the Wright plaintiffs' actual compensatory damages may be applied to the primary policy. We decline to pass on American's policy construction because American effectively waived its argument by not urging it in the district court, and by relying in its primary appellate brief only on the

---

[27] Id.

exclusion of punitive damages under Texas public policy.[28] We therefore believe it prudent to presume that the primary policy language here encompasses punitive damages, and we turn to the next step in the public policy inquiry, examining legislative policy decisions.[29]

As noted by the court in Fairfield, the Texas legislature has been sensitive to the issue of insurance coverage for punitive damages and has made the policy decision to preclude such coverage in certain circumstances.[30] For example, "health care providers" have generally been prohibited from obtaining insurance coverage for punitive damages, although the legislature has recognized exceptions for hospitals, nursing homes, and assisted living facilities by permitting those entities to obtain specific endorsements for such coverage.[31] Res-Care operated the Appleridge facility as an Intermediate Care Facility for the Mentally Retarded (ICF/MR).[32] The Texas legislature has not included

---

[28] See Texas Democratic Party v. Benkiser, 459 F.3d 582, 594 (5th Cir. 2006) (issues not raised in opening brief are generally considered waived). Although we have elected to consider issues raised for the first time in a supplemental brief where there has been an intervening court decision, we have done so where the decision provided an important clarification in the law, and refusal to do so would have resulted in perpetuating incorrect law. See DSC Commc'ns Corp. v. Next Level Commc'ns, 107 F.3d 322, 326 n.2 (5th Cir. 1997). Here, there has been no clarification in the law with respect to the policy language upon which American relies, and American cites decisional law that pre-dates Fairfield in support of an argument that it could have made in its primary brief.

[29] Cf. Fairfield, 246 S.W.3d at 656 (presuming policy language similar to Res-Care's policy covered exemplary damages sought in a suit alleging gross negligence). In light of our presumption we also need not address American's argument that the term "damages" in the primary policy does not include both punitive and compensatory damages, but we note that at least one Texas court has interpreted a similar policy provision contrary to American's argument. See Am. Home Assurance Co. v. Safway Steel Prods. Co., 743 S.W.2d 693, 702 (Tex. App. 1987).

[30] Fairfield, 246 S.W.3d at 656.

[31] Id. at 656 & n.2.

[32] Such facilities are regulated under Chapter 252 of the Texas Health and Safety Code. See TEX. HEALTH & SAFETY CODE § 252.001. Under Chapter 252, a "facility" is defined as a home or establishment that:

16

ICF/MRs in the definition of "health care providers" found in the Texas Insurance Code.[33] As American concedes in its supplemental brief, such entities have not been precluded by an explicit legislative policy decision from obtaining insurance for punitive damages, and they are not required to obtain a specific endorsement for such coverage.[34] Thus, we next consider general public policy and whether insurance coverage for punitive damages is precluded in this case.

In the absence of a specific legislative policy directive, courts determine whether an agreement is unenforceable on public policy grounds "by weighing the interest in enforcing agreements versus the public policy interest against such enforcement."[35] The Texas Supreme Court has framed the analysis as a consideration of the interest in freedom of contract versus the extent to which enforcement of an agreement would frustrate important public policy.[36]

On one hand, Texas recognizes a "strong public policy in favor of preserving the freedom of contract."[37] Although this freedom is not unbounded,

---

(A) furnishes food, shelter, and treatment or services to four or more persons unrelated to the owner;
(B) is primarily for the diagnosis, treatment, or rehabilitation of persons with mental retardation or related conditions; and
(C) provides in a protected setting continuous evaluation, planning, 24-hour supervision, coordination, and integration of health or rehabilitative services to help each resident function at the resident's greatest ability.

TEX. HEALTH & SAFETY CODE § 252.002(4).

[33] See TEX. INS. CODE § 1901.001.

[34] Cf. Westchester Fire Ins. Co. v. Admiral Ins. Co., 152 S.W.3d 172, 188 (Tex. App. 2004) (noting that prior to legislative amendments in 2001, for-profit nursing homes were not prohibited from obtaining coverage for punitive damages under a primary policy and were not required to obtain such coverage via specific endorsement).

[35] Fairfield, 246 S.W.3d at 663.

[36] Id. at 663–64.

[37] Id. at 664.

a court may not lightly interfere with it.[38]  The freedom to contract between an insured and insurer must be upheld absent strong public policy reasons for holding otherwise.[39]

Opposing the freedom of contract is the purpose of punitive damages.[40] The "primary purpose of exemplary damages [is] to punish and deter."[41]  In its most recent enactments on the subject, however, the Texas legislature has downplayed the deterrence aspect of exemplary damages in favor of the punitive aspect.[42]  "[P]unishment imposed through exemplary damages is to be directed at the wrongdoer."[43]  But the Texas Supreme Court recognized in Fairfield that there may be instances when insurance coverage for exemplary damages should be allowed, such as when the insured is a corporation or a business responsible for damages due to the conduct of its employees.[44]  In that case, "[w]here other employees and management are not involved in or aware of an employee's wrongful act, the purpose of exemplary damages may be achieved by permitting coverage so as not to penalize many for the wrongful act of one."[45]

Res-Care argues that its case falls squarely within these parameters for permitting punitive damages insurance coverage for corporations and businesses.  It asserts that no public policy considerations are offended by

---

[38] Id. at 664–65.

[39] Id. at 665.

[40] Id. at 666.

[41] Id.

[42] Id.

[43] Id. at 667

[44] Id. at 670.

[45] Id.

insurance coverage because no Res-Care officers, directors, or shareholders participated in or had knowledge of the Wright plaintiffs' allegations.

The Fairfield court expressed reservations, however, for "[e]xtreme circumstances" where "extreme and avoidable conduct that causes injury" may warrant different considerations.[46] The court expressed concern that insurance coverage for punitive damages could encourage reckless conduct.[47] "Were the existence of insurance coverage to completely eviscerate the punitive purpose behind awarding exemplary damages, it could defeat not only an explicit legislative policy but also the court's traditional role in deterring conscious indifference."[48]

We conclude that the extreme circumstances which gave pause to the Fairfield court are present in the instant case. The Wright plaintiffs' complaint is rife with allegations of gross negligence for which the responsibility should not be shifted from the defendants to the insurer. The complaint alleged that all defendants, including Res-Care, were grossly negligent in their actions, not only for direct participation in the bleach incident on April 12, 1998, but also for failure to take reasonable steps to prevent the situation from occurring, and for failure to alleviate the harm immediately afterward. The many allegations of gross negligence on the part of Res-Care included failing to ensure a safe environment, to properly hire and train its employees, and to ensure that Wright received proper medical care.[49] The complaint also alleged that Kennerly and

---

[46] Id.

[47] Id.

[48] Id.

[49] The allegations specifically included claims that Res-Care (1) failed to provide adequate supervision of Wright; (2) failed to provide Wright with a safe residence; (3) failed to inspect and correct the danger in leaving a mentally disabled client in close proximity to bleach; (4) failed to adequately train its agents, servants, and employees; (5) negligently hired, contracted with and/or retained agents, servants, and employees; (6) failed to follow policies

another individual permitted Wright to lie in the bleach for a prolonged period, failed to bathe or wash the chemicals from Wright's body, and failed to seek appropriate medical care. It further alleged that the defendants' conduct violated the Texas Penal Code by recklessly and negligently causing injury to a disabled person.

Moreover, there were allegations that reports from the State of Texas showed Res-Care poorly operated other facilities, thereby establishing a course of conduct warranting exemplary damages. In Wright's case, an investigation by the Texas Department of Health and Human Services concluded that Wright did not receive an assessment by medical personnel for 17 hours after her exposure to the bleach and that, although she was seen by a nurse the following day, she received no follow-up assessment or medical care for 34 hours until she was sent to the emergency room. The investigation revealed that "the facility failed to ensure that adequate and timely medical assessment and treatment as well as follow up assessment and care were routinely provided to clients residing in the facility." It concluded that "[f]acility negligence is substantiated due to the facility failing to provide prompt, adequate treatment for a client with chemical burns who subsequently died due to complications of those burns."

---

and procedures to ensure prompt medical treatment for injured clients; (7) failed to have an active and appropriate behavior modification program in effect for Wright; (8) failed to keep watch over Wright; (9) failed to properly and promptly access, treat, and/or refer Wright for proper treatment for her burns; (10) failed to properly instruct personnel in the care and treatment of mentally retarded and handicapped individuals, including Wright; (11) failed to timely effect the transfer of Wright to an appropriate hospital or health care provider when she developed symptoms, conditions, and illnesses beyond the treatment capabilities of the group home and/or the group home's physician, Dr. Yalamanchili; (12) failed to get Wright effective medical care; (13) failed to provide an adequate system of preventative and general care which resulted in the delay of proper medical assessment, care, and treatment of Wright; (14) failed to properly hydrate Wright; (15) failed to properly staff the Appleridge group home; (16) failed to respond to emergency conditions at a time when a reasonably prudent operator of an ICF/MR would have done so; (17) failed to provide adequate and proper funds for the care of Wright and the group home in general; (18) negligently hired, contracted with, and retained Dr. R.R. Yalamanchili; and (19) negligently referred clients, including Wright, to Dr. R.R. Yalamanchili.

Significantly, the report concluded that the failure of care evidenced systemic problems at the facility. It therefore recommended that the Appleridge facility be closed.

We conclude that the circumstances of Wright's injury and death, occurring while living in a facility with documented systemic problems of care, were so extreme that the purposes of punishment and deterrence of conscious indifference outweigh the normally strong public policy of permitting the right to contract between insurer and insured.[50] This case demonstrates the kind of "avoidable conduct that causes injury" where public policy is best served by requiring the insured to bear the costs of punitive damages.[51] The district court did not err by failing to apportion any of the punitive damages to the primary policy.

## E. American's cross-appeal

We turn next to American's cross-appeal. American argues first that the district court erred by requiring it to bear the burden of proving the amount of the settlement attributable to uncovered claims. It argues that under Texas law, the insured bears the burden of proving that a claim falls within the scope of an insurance policy's insuring agreement, while the insurer bears the burden of establishing any exclusion to coverage. Res-Care responds that the instant case is not a suit on the insurance policy, but rather a suit for breach of contract under a separate reimbursement agreement. According to Res-Care, American bore the burden of proof as the breach-of-contract plaintiff. We conclude that the district court correctly decided the allocation issue and therefore, based on the record before us, the burden of proof is not dispositive of our decision in this case.

---

[50] Fairfield, 246 S.W.3d at 670.

[51] Id.

As noted above, the purpose of the allocation trial was for the trier of fact to apportion the settlement between covered claims and non-covered claims.[52] We conclude from a review of the record that the district court ably considered the evidence presented and arrived at a reasonable apportionment decision.

Early on in the case, all parties recognized that if there were a trial, a verdict could be well in excess of the policy limits and that there was a significant risk of a very large punitive damages award. However, the district court was not to consider what the damages award might have been had the matter gone to trial.[53] Rather, it was to determine what the parties considered the effect of the settlement to be, which is both a different and difficult question.

Res-Care's defense counsel, Steve Dillawn, initially estimated the covered actual damages to be between $250,000 and $2 million, and he noted in a letter to American that in a similar case a jury had awarded $2.37 million in actual damages but $90 million in punitive damages.[54] The only evidence of concrete economic losses were Wright's medical expenses of approximately $24,000. The Wright plaintiffs' demands for settlement began at $100 million and then decreased to $16 million and $12.5 million before the plaintiffs agreed to the settlement amount of $9 million. American's claims personnel always believed the actual damages were far less than $9 million and that any amount above the actual damages would represent claims for which it was not responsible. Res-Care presented expert testimony that actual damages could have reasonably

---

[52] Enserch, 952 F.2d at 1495.

[53] Id.

[54] Dillawn testified that before the case settled he was concerned that the suit could produce an actual damages award of $10 million. What the damages could have been if the case had been tried is not the proper consideration in the allocation trial. Enserch, 952 F.2d at 1495. Furthermore, testimony from Res-Care's general counsel that Adam Alexander and Elizabeth D'Elia, American's claims personnel, agreed the actual damages were between $8 and $10 million was directly contradicted by the testimony of Alexander and D'Elia, who testified that actual damages were estimated to be $2–$3 million.

included the entire $9 million. However, American offered testimony from its claims personnel that the Wright plaintiffs' counsel indicated there would be no settlement without a payment of punitive damages. Therefore, the district court could reasonably find that the settlement included a punitive damages component.

American never offered more than $2.5 million to settle the case before Res-Care agreed to the non-waiver agreement. American offered testimony and correspondence between its claims personnel and Res-Care's counsel showing that it believed that $2.5 million was completely covered under the primary and umbrella policies and represented the upper limit on the actual damages. It refused to offer anything above that amount unless Res-Care agreed to a reimbursement agreement. In fact, American never offered to settle the case for an amount above $2.5 million until after the reimbursement agreement was signed. Thus, the settlement reasonably included actual damages of at least $2.5 million.

American believed that Wright's actual damages should be limited because (1) Wright had a reduced earning capacity due to her physical and mental disabilities; (2) Wright did not suffer significant pain and suffering according to nursing staff reports; and (3) the claim of Wright's young son for loss of companionship was necessarily limited because the boy lived with his aunt in Dallas and had little contact with his mother in the group home in Houston. The district court concluded that these views were erroneous and increased the amount of actual damages to $4 million. We cannot conclude from a review of the record that this was an unreasonable amount for actual damages. Wright's chemical burns, which covered over 40% of her body, were severe. She made statements to others in the Appleridge facility that she believed Kennerly had "set her on fire" and that at one point it was too painful for her even to put on her underwear. Furthermore, her son was only nine years old at the time of his

mother's death. All these facts support the award for compensatory damages. We conclude that the district court fulfilled its function to reasonably apportion the settlement amount between the covered claims for actual damages and uncovered claims for punitive damages.[55]

American also argues in its cross-appeal that, as the prevailing party in a breach of contract suit, it was entitled to an award of attorney's fees under state law. American contends that Res-Care breached the non-waiver agreement by refusing to reimburse American for portions of the settlement.

Texas law provides for the recovery of reasonable attorney's fees for a claim based on an oral or written contract.[56] A breach of contract does not occur until "a party fails or refuses to do something he has promised to do."[57] Here, the non-waiver agreement provided only that American retained the right to seek recoupment of the portion of the settlement attributable to non-covered claims. It specifically acknowledged (1) American's claim that "a substantial portion" of the amount claimed by the Wright plaintiffs included punitive damages for which it was not responsible and (2) Res-Care's denial of American's claim. American proceeded with its recoupment claim in the allocation trial, and Res-Care was not obligated under the non-waiver agreement to pay any amount pending the outcome of that proceeding. Therefore, because Res-Care did not fail or refuse to do something it had promised to do, there was no breach of contract, and the district court did not abuse its discretion by denying American an award of attorney's fees.[58]

---

[55] See Enserch, 952 F.2d at 1495.

[56] TEX. CIV. PRAC. & REM. CODE § 38.001(8).

[57] Dorsett v. Cross, 106 S.W.3d 213, 217 (Tex. App. 2003).

[58] See Adams v. Unione Mediterranea Di Scurta, 364 F.3d 646, 656 (5th Cir. 2004) ("We review awards of attorneys fees under an abuse of discretion standard.").

Similarly, we find no merit to American's argument that the district court erred by failing to award it prejudgment interest for its breach of contract claim. Because we conclude that there was no breach of contract, the district court did not err by denying prejudgment interest.

The district court's judgment is AFFIRMED.