**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 15, 2011

No. 09-20877

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff–Appellee,

v.

KING ARTHUR; BOSE EBHAMEN; RHONDA FLEMING,

Defendants–Appellants.

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:07-CR-513-6

Before SMITH, DeMOSS, and OWEN, Circuit Judges.

PER CURIAM:[*]

King Arthur, Bose Ebhamen, and Rhonda Fleming were accused of submitting fraudulent claims for durable medical equipment to Medicare and Medicaid. A jury convicted each defendant of health care fraud and wire fraud, as well as conspiracy to commit those crimes. Ebhamen and Fleming were additionally convicted of money laundering. All three defendants appeal their convictions on various grounds. Ebhamen and Fleming additionally challenge their sentences. We affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-20877

# I

Viewing the evidence in the light most favorable to the verdict, the jury could have found the following facts beyond a reasonable doubt.[1]  Rhonda Fleming, King Arthur, and Bose Ebhamen participated in a scheme to submit false claims for durable medical equipment (DME) to Medicare and Medicaid (together, Medicare).[2]  DME includes items such as wheelchairs, motorized scooters and accessories, beds, walkers, and diabetic supplies.  Companies controlled by the defendants purchased and delivered very little DME, yet billed Medicare for more than $34 million.  All told, Medicare reimbursed over $5.8 million into accounts controlled by the defendants.

Rhonda Fleming was the central figure in the fraud scheme.  She formed a medical billing company, Advanced Medical Billing Specialists (AMBS), to submit fraudulent claims to Medicare.  In order to qualify for Medicare reimbursement, each claim submitted must include the DME company's supplier number, as well as specific physician, patient, prescription, and cost information.  AMBS initially used the supplier number from a related DME company Fleming had formed, but that supplier number was revoked shortly after Fleming formed AMBS.  Accordingly, Fleming purchased a supplier number from King Arthur, the owner of Hi-Tech Medical Supply (Hi-Tech), in exchange for a promised monthly salary of $13,000.  Hi-Tech's supplier number was revoked shortly after Arthur and Fleming's agreement, but Fleming discovered that Medicare would reimburse claims with delivery dates prior to the revocation of Hi-Tech's supplier number.  She therefore instructed her employees to submit backdated claims,

---

[1] *See, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

[2] The scheme described in this opinion targeted both Medicare and Medicaid, but most of the money reimbursed by Medicaid was pursuant to Medicaid's role as a secondary payor for particular Medicare transactions.  Because the identity of the payor is irrelevant to the defendants' convictions, we generally refer to the two federal programs as "Medicare."

providing them with handwritten "delivery tickets" containing fraudulent information necessary to complete claims via Medicare's electronic reporting system.

Fleming later purchased another supplier number from Bose Ebhamen, a part-owner of First Advantage Nursing (FAN). AMBS submitted fraudulent claims on that number as well, including claims for dates of service prior to the time Fleming contracted with Ebhamen. Fleming also purchased stolen patient information from former employees to facilitate fraudulent billing on both the Hi-Tech and FAN supplier numbers. Fleming, moreover, was intimately involved in minute details of the fraud, requiring her employees to submit frequent status reports and giving detailed instructions on how to submit claims.

Arthur and Ebhamen remained involved with the scheme after the initial sale of their supplier numbers. Neither Arthur nor Ebhamen notified Medicare, as they were required to do under Medicare regulations, of the sale of their supplier numbers. Both remained as signatories on bank accounts in which Medicare funds were deposited, and both derived, or attempted to derive, significant financial benefits from the scheme. For example, Arthur arranged for the Medicaid portion of reimbursements to be deposited in a separate account over which he maintained sole control. Later, Arthur tried to withdraw over $350,000 from his joint account with Fleming on the same day Fleming tried to withdraw a similar amount. Ebhamen, meanwhile, wrote checks amounting to more than $200,000 from the FAN account to AMBS, herself, and Chase Bank.

Fleming, Arthur, and Ebhamen were convicted of violating and conspiring[3] to violate 18 U.S.C. § 1347 (health care fraud) and 18 U.S.C. § 1343 (wire fraud). Fleming and Ebhamen were additionally convicted of money laundering in violation of 18 U.S.C. §§ 1956, 1957. The district court sentenced Fleming,

_____

[3] 18 U.S.C. § 371.

No. 09-20877

Arthur, and Ebhamen to terms of imprisonment of 360, 95, and 135 months, respectively. On appeal, each defendant argues that the evidence is insufficient to sustain his or her individual convictions. Ebhamen brings forward six additional issues, arguing that (1) certain counts of the indictment were multiplicitous; (2) the district court should have given the jury a cautionary instruction concerning evidence of regulatory violations; (3) the district court improperly instructed the jury that knowledge could be established by deliberate ignorance; (4) the prosecutor improperly impugned Ebhamen's attorney's integrity; (5) the district court should have adjusted Ebhamen's sentence downward because she was a minor participant; and (6) the district court improperly imposed a two-level increase for obstruction of justice. Proceeding pro se, Fleming also argues that the district court erred by delivering the deliberate ignorance instruction. Fleming raises more than forty additional issues, which we address below.

## II

Arthur, Ebhamen, and Fleming contend that they are entitled to judgments of aquittal because the evidence was insufficient to prove the charges for which they were convicted. While we review de novo properly preserved sufficiency objections, our review is "narrow."[4] We ask only whether, "viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt."[5]

## A

We first address Arthur's, Ebhamen's, and Fleming's contentions that the evidence was insufficient to support their convictions for health care fraud and

---

[4] *United States v. Williams*, 520 F.3d 414, 420 (5th Cir. 2008) (internal quotation marks and citations omitted).

[5] *Id.* (internal quotation marks and citation omitted).

No. 09-20877

wire fraud, as well as conspiracy to commit those crimes. To obtain a conspiracy conviction under 18 U.S.C. § 371, the Government must prove (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant knew of the unlawful objective and voluntarily agreed to join the conspiracy; and (3) one or more of the members of the conspiracy committed an overt act in furtherance of the objective of the conspiracy.[6] "The [G]overnment must prove the same degree of criminal intent as is necessary for proof of the underlying substantive offense."[7]

To prove health care fraud under 18 U.S.C. § 1347, the Government must prove (1) the defendant knowingly and willfully executed, or attempted to execute, a scheme or artifice to (a) defraud any health care benefit program or to (b) obtain by false or fraudulent pretenses, representations, or promises any money or property owned by or under the custody or control of a health care benefit program; and (2) the scheme or artifice was in connection with the delivery of or payment for health care benefits, items, or services.[8] Wire fraud under 18 U.S.C. § 1343 requires the Government to prove: "(1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in

---

[6] *United States v. Elashyi*, 554 F.3d 480, 496 (5th Cir. 2008).

[7] *United States v. Dadi*, 235 F.3d 945, 950 (5th Cir. 2000).

[8] 18 U.S.C. § 1347; *see also United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009), *cert. denied*, 131 S. Ct. 538 (2010).

No. 09-20877

furtherance of the scheme."[9] Both health care fraud[10] and wire fraud[11] require that the Government prove a "conscious knowing intent to defraud."[12]

**1**

Arthur and Ebhamen do not contend that health care fraud and wire fraud did not occur. Rather, Arthur and Ebhamen argue that the evidence is insufficient to show that they had knowledge of the health care fraud scheme, or the intent to defraud necessary to sustain their convictions for health care fraud, wire fraud, and conspiracy to commit those crimes. Arthur also contends that the evidence is insufficient to show that he had knowledge of the conspiracy or the intent to join it.

We have set forth above evidence supporting the verdict under the applicable standard, including Arthur's and Ebhamen's failure to notify Medicare of the sale of their supplier numbers and the financial rewards they reaped from participating in the scheme. The Government also presented ample other evidence from which a rational jury could infer that Arthur and Ebhamen had the requisite intent to defraud, and that Arthur had knowledge of, and willingly participated in, the conspiracy. That evidence included testimony and exhibits casting doubt on Arthur's and Ebhamen's assertions that they were duped by Fleming into participating in an illegitimate business. For instance, prior to contracting with Fleming, Arthur's medical equipment business was unsuccessful; he had never purchased a motorized wheelchair. Similarly,

---

[9] *United States v. Ingles*, 445 F.3d 830, 838 (5th Cir. 2006) (internal quotation marks and citation omitted).

[10] *See* 18 U.S.C. § 1347; *see also Martinez*, 588 F.3d at 314.

[11] *United States v. Brown*, 459 F.3d 509, 519 (5th Cir. 2006).

[12] *Id.* (internal quotation marks and citation omitted).

6

No. 09-20877

Ebhamen had made only a handful of Medicare claims before she agreed to a contract with Fleming splitting proceeds 35/65.

The Government also presented evidence showing that Medicare continued to send remittance notices and overpayment letters to Arthur's and Ebhamen's business address. These documents—which detailed the high volume of claims paid and denied on Arthur's and Ebhamen's supplier number—were later discovered in AMBS's files. The jury could have inferred that Arthur sent the notices to AMBS, as the Hi-Tech notices were fax transmittals bearing the tag line from Arthur's office. Similarly, the jury could have inferred that Ebhamen delivered the notices to AMBS, as the Government presented evidence to that effect. Further, the jury could have inferred the defendants' knowledge and fraudulent intent from these notices because they contained claims pre-dating the defendants' business relationships with Fleming.

When Ebhamen took the stand at trial, her primary defense was that FAN was her husband's business and that she did not understand its nature. The Government's evidence demonstrated, however, that it was Ebhamen, not her husband, who signed the application for the supplier number and consistently represented to Medicare inspectors that she was FAN's owner. Ebhamen also personally participated in the effort to have FAN's supplier number reinstated when it was revoked, signing a letter to Medicare seeking reinstatement and appearing at a telephone hearing as the FAN representative. Despite Ebhamen's testimony to the contrary, a rational juror could have concluded, based on evidence presented by the Government, that fraudulent documents were attached to Ebhamen's letter and that she lied during the telephone hearing.

The evidence described above represents only a small portion of that contained in the entire record. We have little trouble concluding that Arthur's and Ebhamen's sufficiency challenges fail. Moreover, Arthur's and Ebhamen's

7

contention that the verdict should be overturned because they did not know all the coconspirators is meritless.[13]  Finally, Arthur's argument that the evidence is insufficient to show accomplice liability is not well taken.  Even assuming it had merit, however, any error would be harmless in light of this court's rule on conspiracy liability.[14]

**2**

Fleming also challenges the sufficiency of the evidence, but her challenges are similarly meritless.  She argues there was no agreement sufficient to prove the existence of a conspiracy or, alternatively, that she had no knowledge of the conspiracy.  She also argues she did not personally execute a scheme to defraud and that she is not liable for her employees' actions.  As detailed above, however, the evidence overwhelmingly demonstrates that Fleming orchestrated the conspiracy to commit health care fraud and wire fraud.

Fleming also argues that the evidence with respect to health care fraud is insufficient to maintain her conviction.  She contends that personal testimony from each of the affected beneficiaries was required to support her convictions for thirty-five counts of health care fraud.  We discern no requirement for individual beneficiary testimony from the language of the statute.[15]  The Government's evidence, including its detailed documentary evidence for each count of health care fraud, is sufficient to sustain Fleming's convictions.  The Government's detailed evidence of banking transactions also plainly supports Fleming's convictions for wire fraud, despite her assertions to the contrary.

---

[13] *United States v. Garcia Abrego*, 141 F.3d 142, 155 (5th Cir. 1998).

[14] *United States v. Garcia*, 917 F.2d 1370, 1377 (5th Cir. 1990) ("Each conspirator may be held criminally culpable for substantive offenses committed by the conspiracy of which he is a member while he is a member." (internal quotation marks, brackets, and citation omitted)).

[15] *See also Martinez*, 588 F.3d at 315 (rejecting sufficiency claim based on lack of individualized patient testimony for each count of indictment).

No. 09-20877

**B**

We now address Ebhamen's and Fleming's arguments that the evidence was insufficient to convict them of money laundering.

**1**

On the basis of three checks written by Ebhamen to AMBS and deposited by Fleming, both Ebhamen and Fleming were convicted of three counts of violating 18 U.S.C. § 1956(a)(1)(A)(i).  We have previously held that to sustain a conviction for money laundering under this section, the Government must prove beyond a reasonable doubt "(1) the financial transaction in question involves the proceeds of unlawful activity, (2) the defendant had knowledge that the property involved in the financial transaction represented proceeds of an unlawful activity, and (3) the financial transaction was conducted with the intent to promote the carrying on of a specified unlawful activity."[16]  Neither defendant argues that the financial transactions in question were not in fact conducted, or that the funds used in those transactions were not the proceeds of unlawful activity.[17]  Rather, both defendants contend that the checks written by Ebhamen to AMBS merely represent the division of criminal proceeds and do not show their intent to promote a specified unlawful activity.

In *United States v. Valuck*, we held the defendant's negotiation and deposit of cashier's checks received from his accomplice was sufficient to sustain the defendant's conviction for money laundering promotion, even though the unlawful crime promoted was the antecedent wire fraud.[18]  Here, Fleming's

---

[16] *United States v. Valuck*, 286 F.3d 221, 225 (5th Cir. 2002).

[17] In a supplemental brief to this court, Fleming contends that *United States v. Santos*, 553 U.S. 507 (2008), requires reversal of her convictions for money laundering.  We address this contention in Section X of this opinion.

[18] 286 F.3d at 225-28.

deposit of the checks written by Ebhamen is similarly sufficient to sustain Fleming's conviction for money laundering promotion.

Ebhamen contends that absent proof she placed conditions on the funds delivered to Fleming via check, the evidence is insufficient to show her intent to promote an illegal activity. She argues the following statement from *United States v. Miles* supports her position: "The crime of money laundering promotion is aimed not at maintaining the legitimate aspects of a business nor at proscribing all expenditures of ill-gotten gains, but only at transactions which funnel ill-gotten gains directly back into the criminal venture."[19]

We are not persuaded. Ebhamen points to no evidence suggesting the money she paid Fleming was used for legitimate business expenditures. Moreover, *Valuck* lends support to Ebhamen's convictions. Though we did not consider whether the accomplice's purchase of cashier's checks in that case would support a conviction for money laundering promotion, we noted that "this court subscribes to a broad interpretation of the word 'promote' within the context of section 1956 . . . to 'promote' something is to 'contribute to [its] growth, enlargement, or prosperity.'"[20] We have little difficulty concluding that Ebhamen's payments to Fleming evince the intent to contribute to the growth, enlargement, or prosperity of the conspiracy. Indeed, the payments were the lifeblood of the conspiracy. The contract between AMBS and FAN required payment each Friday, and the record shows that Fleming unfailingly insisted that payments be timely. If the payments stopped, there is little doubt Fleming would have ended the relationship with Ebhamen, denying her the opportunity to profit further from the conspiracy. A rational jury could have concluded that

---

[19] 360 F.3d 472, 479 (5th Cir. 2004).

[20] *Valuck*, 286 F.3d at 226 (quoting BLACK'S LAW DICTIONARY 1214 (6th ed. 1990)).

No. 09-20877

Ebhamen had the requisite intent to promote the carrying on of a specified unlawful activity.

**2**

Fleming was convicted on eighteen additional counts of money laundering. Specifically, she was convicted of five counts of money laundering promotion for her payments to former employees for stolen patient files; eight counts of violating 18 U.S.C. § 1956(a)(1)(B)(i) for her actions to conceal fraudulently obtained funds; and five counts of violating 18 U.S.C. § 1957, which prohibits spending criminally derived funds in transactions greater than $10,000.

Fleming's challenge to the sufficiency of the evidence on these counts is meritless, as each count is supported by testimony and individual documentation. Her argument that she did not have knowledge that the funds were the proceeds of an unlawful transaction is belied by the record. Moreover, her transfers to other bank accounts and payments to individuals are the epitome of concealment under § 1956(a)(1)(B)(i): she "intended to and did make it more difficult for the [G]overnment to trace and demonstrate the nature of" the funds.[21]

**III**

Ebhamen contends, for the first time on appeal, that the money laundering counts alleged against her in the indictment are multiplicitous and her convictions are therefore unconstitutional under the Double Jeopardy Clause.[22] As discussed above, Ebhamen was convicted of violating 18 U.S.C. § 1956(a)(1)(A)(i) on the basis of three checks she wrote to AMBS. Based on the same three transactions, Ebhamen was also convicted for three separate counts of violating 18 U.S.C. § 1957.

---

[21] *United States v. Brown*, 553 F.3d 768, 787 (5th Cir. 2008).

[22] U.S. CONST. amend. V.

No. 09-20877

To the extent that Ebhamen challenges the district court's failure to require the Government to elect between charging her under § 1956 or § 1957, that argument has been waived by Ebhamen's failure to seek dismissal of the indictment pursuant to FED. R. CRIM. P. 12(b) prior to trial.[23] To the extent that Ebhamen challenges her sentences under both statutes, we may review that claim for plain error.[24]

The district court did not commit error, let alone plain error, when it sentenced Ebhamen under both statutes. The Fifth Amendment's Double Jeopardy clause "is meant to protect against both multiple prosecutions and, relevant here, multiple punishments for the same offense."[25] "[T]he proper test for determining whether a defendant has been punished twice for the same offense [is] 'whether each provision requires proof of a fact which the other does not.'"[26] Our inquiry is focused not on particular factual circumstances, but on the elements of the statutory offense.[27] Thus, the proper inquiry is whether all violations of § 1957 constitute violations of § 1956(a)(1)(A)(i), and vice versa.[28]

Here, it is clear not every violation of § 1957 is also a violation of § 1956(a)(1)(A)(i), or vice versa. Section 1957(a) requires the Government to prove: (1) property valued at more than $10,000 was derived from specified unlawful activity; (2) the defendant engaged in a monetary transaction with this

---

[23] *United States v. Gerald*, 624 F.2d 1291, 1300 (5th Cir. 1980) ("Rule 12(b)(1) of the Federal Rules of Criminal Procedure provides that failure to raise objections to defects in the indictment before trial amounts to a waiver of the objection.").

[24] *United States v. Bradsby*, 628 F.2d 901, 905-06 (5th Cir. Unit A 1980); *see also United States v. Ogba*, 526 F.3d 214, 232 (5th Cir. 2008).

[25] *United States v. Odutayo*, 406 F.3d 386, 392 (5th Cir. 2005).

[26] *Id.* (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

[27] *Id.*

[28] *See id.* (applying test to 18 U.S.C. §§ 1341, 1342).

property; and (3) the defendant knew this property was derived from unlawful activity.[29] Section 1956(a)(1)(A)(i), by contrast, requires the Government to prove "(1) the financial transaction in question involves the proceeds of unlawful activity, (2) the defendant had knowledge that the property involved in the financial transaction represented proceeds of an unlawful activity, and (3) the financial transaction was conducted with the intent to promote the carrying on of a specified unlawful activity."[30] Thus, not every violation of § 1957 is also a violation of § 1956(a)(1)(A)(i) because a violation of the former does not require proof of intent to promote unlawful activity. Similarly, not every violation of § 1956(a)(1)(A)(i) is a violation of § 1957 because a violation of the former does not require that the proceeds of the unlawful activity be valued at more than $10,000. Accordingly, Ebhamen's claim that her sentences violate the Double Jeopardy clause fails.

## IV

Ebhamen next contends the district court erred by not submitting a limiting instruction to the jury concerning evidence of regulatory violations. Ebhamen did not request a cautionary instruction at trial, so our review is for plain error.[31] Addressing a similar issue in *United States v. Saks*, we noted that the Government "would be hard pressed to prove that defendants defrauded federal regulators without mention of the regulations these officials are responsible for enforcing. It would also be difficult to explain the stakes in a bank fraud case without some reference to the rules by which these institutions

---

[29] *United States v. Wilson*, 249 F.3d 366, 379 (5th Cir. 2001), *abrogated on other grounds*, *Whitfield v. United States*, 543 U.S. 209 (2005).

[30] *United States v. Valuck*, 286 F.3d 221, 225 (5th Cir. 2002).

[31] *United States v. Saks*, 964 F.2d 1514, 1523 (5th Cir. 1992).

are governed."[32]  Similarly, the evidence concerning violations of Medicare regulations in this case—including evidence Ebhamen failed to notify Medicare of the sale of FAN's supplier number and evidence FAN, on several occasions, did not have sufficient DME inventory to meet regulatory requirements—provided context for the jurors to help them understand the scheme to defraud Medicare.

The evidence was also admitted for the allowed purpose of showing Ebhamen's state of mind—her intent to defraud—and in order to cast doubt on her credibility.  Relying on *United States v. Christo,*[33] Ebhamen contends that evidence of regulatory violations is not relevant to the question of fraudulent intent.  This court has expressly noted, however, that "*Christo* does not prohibit and subsequent cases explicitly permit use of such evidence for [showing state of mind] or similar purposes."[34]  This case, moreover, is not similar to *Christo*: the Government did not exclusively rely on Medicare violations to prove its case, and it never argued that regulatory violations equaled guilt for the substantive crimes.[35]  Moreover, the court did not mention Medicare violations in its instructions to the jury.[36]  The district court did not commit plain error when it did not issue a cautionary instruction.

## V

Ebhamen and Fleming contend the evidence did not support the district court's use of a deliberate ignorance instruction.  The court instructed the jury

---

[32] *Id.*

[33] 614 F.2d 486 (5th Cir. 1980).

[34] *United States v. Ramos*, 537 F.3d 439, 460 (5th Cir. 2008) (citing *United States v. Butler*, 429 F.3d 140, 150 (5th Cir. 2005), and *United States v. Cordell*, 912 F.2d 769, 777 (5th Cir. 1990)).

[35] *See id.*; *see also Christo*, 614 F.2d at 489.

[36] *Christo*, 614 F.2d at 490-91.

that it could "find that a defendant had knowledge of a fact" if the defendant "deliberately closed his or her eyes to what would otherwise have been obvious to him or her" or "deliberately blinded himself or herself to the existence of a fact." Because both defendants objected to this instruction below, we review the court's decision for an abuse of discretion.[37] In reviewing whether an instruction was supported by the evidence, we view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the Government.[38]

We have previously said that "an error in giving the deliberate ignorance instruction is harmless where there is substantial evidence of actual knowledge."[39] Because there is substantial evidence Fleming possessed actual knowledge of the fraudulent scheme, the deliberate ignorance instruction, if error, was harmless as to her.

There was also significant evidence that Ebhamen had actual knowledge of the fraud. She signed the 35/65 contract with Fleming, presented fraudulent documents to Medicare officers, and wrote checks from the FAN account to AMBS, herself, and Chase Bank. She regularly represented herself as the owner of FAN. Medicare remittance notices and overpayment letters, as well as bank statements reflecting large deposits from Medicare, were mailed to FAN's office. We conclude this evidence is sufficient to make any error in instructing the jury on deliberate ignorance harmless as to Ebhamen as well.

Moreover, even if Ebhamen did not have actual knowledge, the district court did not abuse its discretion by instructing the jury on deliberate ignorance.

---

[37] *United States v. Nguyen*, 493 F.3d 613, 619 (5th Cir. 2007).

[38] *Id.*

[39] *United States v. Mendoza-Medina*, 346 F.3d 121, 134 (5th Cir. 2003) (internal quotation marks and citation omitted).

No. 09-20877

We have said that "a deliberate ignorance instruction is justified where the evidence shows (1) subjective awareness of a high probability of the existence of illegal conduct and (2) purposeful contrivance to avoid learning of the illegal conduct."[40]  Here, the same evidence that would support a finding of actual knowledge, discussed above, also suggests that Ebhamen had a subjective awareness of the high probability of illegal conduct.  We have held that the second prong can be satisfied when the circumstances present are "so overwhelmingly suspicious that the defendant['s] failure to conduct further inspection or inquiry suggests a conscious effort to avoid incriminating knowledge."[41]  Here, Ebhamen's DME company was singularly unsuccessful prior to engaging with Fleming.  Within months of selling the supplier number, however, hundreds of thousands of dollars poured into FAN's accounts.  The money continued coming in even after FAN lost its supplier number, a fact of which Ebhamen was well aware because she applied to have it reinstated.  Ebhamen wrote large checks from the FAN account, yet claims to have never looked at the bank statements.  She also claims she did not view the remittance notices or overpayment letters.  We have little trouble concluding these circumstances are so overwhelmingly suspicious that Ebhamen's failure to conduct further investigation suggests "a conscious effort to avoid incriminating knowledge."[42]  Accordingly, the district court did not abuse its discretion by delivering a deliberate ignorance instruction to the jury.

## VI

Ebhamen next contends the prosecutor made an improper remark about Ebhamen's attorney that was "highly prejudicial, improperly argumentative and

---

[40] *Nguyen*, 493 F.3d at 619 (internal quotation marks and citation omitted).

[41] *Id.* at 621 (internal quotation marks and citation omitted).

[42] *Id.*

caused [her] undue harm." The remark in question occurred on day fifteen of the trial, the same day Ebhamen was on the stand for cross-examination. That morning, the prosecutor introduced a corrected version of Government Exhibit 409A, the transcript of the Medicare telephone hearing at which Ebhamen appeared. The prosecutor explained that eight or nine lines were missing from the original version, and that the corrected version corresponded with the recording the jury had heard earlier in the trial. Ebhamen's counsel, Mr. Waska, did not object to the substituted transcript.

Later, during Ebhamen's cross-examination, the prosecutor began playing a tape of the Medicare hearing. Waska interrupted, stating, "Your Honor, may I ask are we talking—what exhibit? Because we have an altered transcript in the case." The prosecutor objected to Waska's comment as a sidebar with no proof. In the presence of the jury, Waska, the judge, and the prosecutor engaged in a lengthy exchange concerning how to differentiate between the two transcripts, which used different fonts and margins but contained the same information. Ultimately, it was decided the corrected transcript would be renamed as Exhibit 409A1. During the course of her testimony, Ebhamen continued to express confusion about the "different" transcript and accused the prosecutor of "trying to put something on me that never existed." The prosecutor subsequently asked Ebhamen to read the transcripts line-by-line. When Ebhamen admitted the transcripts were identical and she simply had trouble locating the text due to the different layouts, the prosecutor asked, "Did you know when you got up here that your attorney, Mr. Waska, was going to intentionally mislead the jury about that?" Waska objected, and the district court instructed the prosecutor to "keep it civil." The prosecutor withdrew the question.

No. 09-20877

We review purportedly improper prosecutorial remarks in two steps.[43] First, we must determine whether, considering the context in which it was made, the remark was improper.[44] We will assume, without deciding, that the remark here was improper. Our next inquiry is whether the remark "prejudiced the defendant's substantive rights."[45] "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict."[46] In making that determination, we consider "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt."[47]

The statement here was not so prejudicial as to warrant reversal. On its face, the statement was not unduly prejudicial because it did not suggest that the prosecutor was privy to some information about defense counsel not available to the jury. Rather, the jury observed each exchange and could make its own judgment as to the parties' motivations—indeed, it is possible the jury shared defense counsel's confusion. The district court instructed the prosecutor to be "civil," and he withdrew the question. The court later instructed the jury to disregard questions to which the court sustained objections. Finally, the Government's evidence of Ebhamen's guilt was strong. Viewed in context, the prosecutor's remark did not "cast serious doubt on the correctness of the jury's verdict."[48] Moreover, Ebhamen's reliance on *United States v. McDonald* is misplaced because the prosecutor's remark about Ebhamen's attorney did not

---

[43] *United States v. Insaulgarat*, 378 F.3d 456, 461 (5th Cir. 2004).

[44] *Id.*

[45] *Id.* (internal quotation marks and citation omitted).

[46] *Id.* (internal quotation marks and citation omitted).

[47] *Id.* (internal quotation marks and citation omitted).

[48] *Id.* (internal quotation marks and citation omitted).

No. 09-20877

impute guilt to Ebhamen or imply that she sought representation because she was guilty.[49]

## VII

Ebhamen argues the district court erred by failing to apply a two-point downward adjustment to her offense level pursuant to U.S.S.G. § 3B1.2(b) because she was a "minor participant" in the fraud scheme. We review the district court's interpretation of the Sentencing Guidelines de novo and its factual determinations for clear error.[50] Unless a factual finding is implausible in light of the record as a whole, it is not clearly erroneous.[51]

Section 3B1.2 provides that when a defendant is a "minimal participant" or "minor participant" in a criminal activity, a district court may reduce the defendant's offense level by four or two levels, respectively.[52] A "minor participant" is one "who is less culpable than most other participants, but whose role could not be described as minimal."[53] Because this determination is fact-based, we will "upset a sentence only if that finding is clearly erroneous."[54]

We have previously determined that a "minor participant must be peripheral to the advancement of the criminal activity."[55] In light of Ebhamen's significant role in perpetrating the fraud, the district court's determination that Ebhamen was not a minor participant is not clearly erroneous.

---

[49] *See United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980).

[50] *United States v. Griffith*, 522 F.3d 607, 611 (5th Cir. 2008).

[51] *Id.* at 611-12.

[52] U.S. SENTENCING GUIDELINES MANUAL § 3B1.2 (2008).

[53]  *Id.* § 3B1.2(b) cmt. n.5.

[54] *Griffith*, 522 F.3d at 612.

[55] *United States v. Martinez-Larraga*, 517 F.3d 258, 272 (5th Cir. 2008).

## VIII

Ebhamen also challenges the district court's two-level enhancement of her sentence for obstruction of justice under U.S.S.G. § 3C1.1, arguing that the district court did not make the required factual findings before applying the enhancement. "We review the district court's factual findings in applying the Sentencing Guidelines for clear error."[56]

In *United States v. Dunnigan*, the Supreme Court held that "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out."[57] The Court defined perjury as "giv[ing] false testimony [under oath] concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."[58] "While it is preferable that the district court 'address each element of the alleged perjury in a separate and clear finding,' the district court's findings are sufficient if 'the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury.'"[59]

We conclude the district court fulfilled its duty. During the sentencing hearing, the court stated, "I also believe, having sat through the trial and listened to Ms. Ebhamen's testimony, that she did commit perjury and obstruct justice during the course of the trial, so I am going to agree with the Government that the two-level enhancement for obstruction of justice should be applied."

---

[56] *United States v. Creech*, 408 F.3d 264, 270 (5th Cir. 2005).

[57] 507 U.S. 87, 95 (1993).

[58] *Id.* at 94 (citing 18 U.S.C. § 1621(1)).

[59] *Creech*, 408 F.3d at 271 (quoting *Dunnigan*, 507 U.S. at 95).

No. 09-20877

Although the district court's statement did not "address each element of the alleged perjury," when read in light of the Government's written objections to the presentence investigation report and the arguments presented by counsel at the sentencing hearing concerning Ebhamen's testimony at trial, the statement "encompasse[d] all the factual predicates for [such] a finding."[60]

## IX

Fleming raises many additional claims of error. We address claims related to her mental health, sentencing, and other matters below.

## A

Citing *Pate v. Robinson*,[61] Fleming contends her due process rights were violated by the trial court's failure to hold a competency hearing *sua sponte*. Before Fleming elected to proceed pro se, the district court granted her counsel's two requests that Fleming undergo psychological evaluations. Although the psychologists' reports issued following the evaluations noted Fleming had been diagnosed with bipolar disorder and chronic, severe post-traumatic stress disorder, the reports also stated Fleming was competent to stand trial and was sane at the time of the offense. Thus, there was no evidence the trial judge "receive[d] information which, objectively considered, should reasonably have raised a doubt about [the] defendant's competency," alerting the judge to the possibility that Fleming "could neither understand the proceedings or appreciate their significance, nor rationally aid [her] attorney in [her] defense."[62] Fleming's *Pate* claim therefore fails. Fleming's claim that proceeding to trial was improper

---

[60] *Id.*

[61] 383 U.S. 375 (1966).

[62] *Roberts v. Dretke*, 381 F.3d 491, 497 (5th Cir. 2004) (internal quotation marks and citation omitted) (first alteration in original).

because the order finding her incompetent was not superceded also fails, as no such order existed.

Fleming's claim that the district court wrongly ordered her forcibly medicated without examining the criteria set forth in *Sell v. United States*[63] likewise fails, as the record demonstrates Fleming voluntarily agreed to take her medication as a condition of being allowed to proceed pro se. Fleming also argues she was incompetent because no psychiatrist ever determined she "had enough medication in her system to reach the therapeutic levels needed for competency," and that interruptions in her medication regime during trial affected her competency. There is no evidence in the record that medication was required to make Fleming competent. Despite Fleming's assertions to the contrary, the district court expressed doubt about her *ability* to represent herself absent medication, not her *competency* to stand trial. Moreover, there is no evidence in the record showing Fleming was not medicated adequately at the time of trial.

Fleming challenges the district court's denial of her motion for recusal pursuant to 28 U.S.C. § 455(a) and (b)(1). That motion sought recusal on the basis of the court's ex parte consultation with a prison doctor concerning Fleming's medication, which the court required her to take in order to represent herself. Fleming's motion to recuse was filed nine months after the time of the ex parte communication and five months after trial. Though this court has adopted no per se rule regarding timeliness, the general rule is that "one seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification."[64] Because we conclude that Fleming's motion was untimely, we do not further consider her claim of error.

---

[63] 539 U.S. 166, 180-81 (2003).

[64] *United States v. Sanford*, 157 F.3d 987, 988 (5th Cir. 1998) (internal quotation marks and citation omitted).

No. 09-20877

Fleming next argues the district court improperly denied her request for appointment of a mental health expert under 18 U.S.C. § 3006A(e)(1). The same day Fleming moved for appointment of an expert, the district court ordered her to provide, within ten days, specific information regarding the expert, the area of testimony, and cost. Despite an extension of time, Fleming never did so. We have said that "[t]o justify the authorization of [expert] services under § 3006A(e)(1), a defendant must demonstrate[,] with *specificity*, the reasons why such services are required."[65] Despite several opportunities to provide such specific information, Fleming failed to do so. The court did not abuse its discretion in denying her request.[66]

Fleming also argues for the first time on appeal that, under § 3006A(e)(1), the district court was required to hold a formal hearing on her request for appointment of an expert. We have explained that "[n]either the statute's plain language nor our caselaw interpreting it supports" a rule "requir[ing] in all circumstances that a district court hold a hearing on an ex parte application for appointment under § 3006A(e)."[67] Accordingly, Fleming's claim fails because any error by the district court was not clear or obvious.[68]

Three months after trial, Fleming submitted a motion entitled "Motion for Ex Parte Hearing For Appointment of Independent Mental Health Expert Under 18 U.S.C., Section 3006 [sic]." Still, Fleming did not provide any specific

---

[65] *United States v. Gadison*, 8 F.3d 186, 191 (5th Cir. 1993).

[66] *See generally United States v. Hardin*, 437 F.3d 463, 468 (5th Cir. 2006) (reviewing a district court's denial of a motion for expert appointment under the CJA for abuse of discretion).

[67] *Id.* at 470.

[68] *United States v. Juarez*, 626 F.3d 246, 254 (5th Cir. 2010) (stating the plain error standard of review applies to claims of error not raised below).

information regarding her request. The district court did not abuse its discretion when it denied the motion.[69]

Fleming argues the district court improperly excluded expert evidence pertaining to her insanity defense. This claim is waived because it is advanced for the first time on appeal.[70] Fleming only argued in the district court that she lacked the ability to form specific intent, not that she could not appreciate the nature and quality of the wrongfulness of her acts.[71]

Fleming also argues the district court improperly excluded evidence pertaining to her diminished capacity defense, a ruling we review for an abuse of discretion.[72] Even assuming that diminished capacity evidence is admissible to defeat the mental state requirement for a specific intent crime, a matter we do not decide, Fleming "wholly failed to explain—on appeal and before the district court—how [her] mental condition negated [her] intent."[73] Accordingly, the district court did not abuse its discretion in excluding Fleming's evidence. Similarly, the district court did not err in denying Fleming a diminished capacity jury instruction, a matter we review de novo.[74] Fleming did not present sufficient evidence to permit the jury to "find to a high probability" that she lacked the intent necessary to commit the crime.[75]

---

[69] *Hardin*, 437 F.3d at 468.

[70] *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993).

[71] *See United States v. Eff*, 524 F.3d 712, 716 (5th Cir. 2008) ("Where a defendant asserts an insanity defense, the ultimate issue is whether at the time of the crime the defendant appreciated the nature and quality or the wrongfulness of his acts." (internal quotation marks and citation omitted)).

[72] *United States v. Dixon*, 185 F.3d 393, 398 (5th Cir. 1999).

[73] *Eff*, 524 F.3d at 720 n.11.

[74] *Dixon*, 185 F.3d at 403.

[75] *See id.* at 404.

No. 09-20877

## B

Fleming alleges several claims of error with respect to sentencing, but none are well taken. First, the district court's determination of sentencing factors under the Guidelines did not violate Fleming's rights under the Sixth Amendment.[76] Fleming's related arguments that the sentencing factors should have been included in the indictment and jury charge are also without merit.[77] Similarly, the advisory nature of the Guidelines does not violate her Sixth Amendment rights.[78]

Fleming next contends that the district court improperly calculated her criminal history score by relying on the 2008 Guidelines, instead of the 2003 version in effect when she committed the offenses. Post-*Gall*, we "continue to review the district court's application of the Guidelines *de novo* and its factual findings for clear error."[79] We have held that a "sentencing court must apply the version of the sentencing [G]uidelines effective at the time of sentencing unless application of that version would violate the *Ex Post Facto* Clause of the Constitution."[80] Fleming's offense level and criminal history category would be the same under both the 2003 and 2008 Guidelines; therefore, application of the version of the Guidelines in effect at the time of sentencing did not "result[] in

---

[76] *See United States v. Booker*, 543 U.S. 220, 245 (2005).

[77] *See id.*

[78] *Id.*; *see also Gall v. United States*, 552 U.S. 38, 49 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." (internal citation omitted)).

[79] *United States v. Delgado-Martinez*, 564 F.3d 750, 751 (5th Cir. 2009).

[80] *United States v. Rodarte-Vasquez*, 488 F.3d 316, 322 (5th Cir. 2007) (internal quotation marks and citations omitted).

No. 09-20877

a harsher penalty than would application of the Guidelines in effect when the offense was committed."[81]

The district court applied a twenty-two-level increase to Fleming's base offense level because it determined the intended loss amount from Fleming's fraud was $34 million.[82] In supplemental briefing to this court, Fleming contends our recent decision in *United States v. Isiwele*[83] demonstrates that the district court erred in applying the twenty-two-level increase. We held in *Isiwele* that, while the amount fraudulently billed to Medicare is "prima facie evidence of the amount of loss the defendant intended to cause," the "amount billed does not constitute conclusive evidence of intended loss."[84] Rather, the "parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent."[85] We note initially that Fleming waived any argument contesting the district court's method of calculating intended loss because she did not contest that method below.[86] Alternatively, to the extent this argument was not waived by virtue of Fleming's failure to advance it below, her defective supplemental brief containing no citation to record evidence demonstrating that the amount billed exaggerates the intended loss also constitutes waiver.[87]

---

[81] *Id.*

[82] *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.3(A) (2008) (defining "loss" as "the greater of actual loss or intended loss").

[83] 635 F.3d 196 (5th Cir. 2011).

[84] *Id.* at 203 (internal quotation marks and brackets omitted).

[85] *Id.* (internal quotation marks and citation omitted).

[86] *Nunez v. Allstate Ins. Co.*, 604 F.3d 840, 846 (5th Cir. 2010) ("An argument not raised before the district court cannot be asserted for the first time on appeal." (internal quotation marks and citation omitted)).

[87] *See Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993).

In a related issue, Fleming argues the district court violated her rights by failing to provide her with a trial transcript, which she requested prior to sentencing in order to contest the intended loss amount. Fleming cites no authority for the proposition that the district court was required to provide her with a transcript prior to sentencing. Even assuming such a requirement exists, any error was harmless. Fleming had a copy of the transcript for this appeal and, as noted above, she has not cited any record evidence demonstrating that the amount billed exaggerates the intended loss.

We do not have jurisdiction to review the district court's denial of Fleming's request for a downward departure for diminished capacity under U.S.S.G. § 5K2.13 unless the "district court held a mistaken belief that the Guidelines do not give it the authority to depart."[88] Fleming points to no evidence the district court was unaware of its authority.

Finally, Fleming contends the district court erred when it denied her motion for a continuance pursuant to FED. R. CRIM. P. 32(g). That rule states the probation officer must provide "the presentence report and an addendum containing any unresolved objections, the grounds for those objections, and the probation officer's comments on them" to the court and the parties at least seven days before sentencing. The probation officer timely provided a report and a supplemental response to the parties' objections—including Fleming's—over a month before sentencing. Fleming filed further objections to the PSR three days before sentencing, to which the probation officer also responded, albeit not seven days prior to sentencing. Fleming points to no authority for the proposition that a defendant can restart Rule 32(g)'s seven-day requirement by filing further objections to the PSR, and we find none. Although such an interpretation would seemingly produce an absurd result—allowing a defendant to postpone

---

[88] *United States v. Lucas*, 516 F.3d 316, 350 (5th Cir. 2008).

No. 09-20877

sentencing indefinitely—we need not decide the issue. Assuming error, such error was harmless: Fleming had an adequate opportunity to object to the PSR.[89]

## C

Fleming asserts, for the first time on appeal, that the district court should have dismissed the indictment against her under FED. R. CRIM. P. 48(b). The burden of proving prejudicial delay rests on Fleming.[90] She has not demonstrated that any delay in this case was "intentionally undertaken by the [G]overnment for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose."[91] Accordingly, the district court did not err, let alone plainly err, by not dismissing the indictment.

Fleming also argues the district court erred when it refused to grant her request for an evidentiary hearing, filed more than five months after the verdict was rendered, on jury tampering. The district court did not abuse its discretion in denying Fleming's request because her claim the jurors engaged in "smoke break deliberations" with employees of the United States Marshals service was purely speculative.[92]

## D

Though "we construe *pro se* pleadings liberally, *pro se* litigants, like all other parties, must abide by the Federal Rules of Appellate Procedure."[93] Rule

---

[89] *See United States v. Roberge*, 565 F.3d 1005, 1011-12 (6th Cir. 2009).

[90] *United States v. Gulley*, 526 F.3d 809, 820 (5th Cir. 2008) (per curiam).

[91] *United States v. Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996) (en banc).

[92] *United States v. Smith*, 354 F.3d 390, 394 (5th Cir. 2003) ("A district court is not required to conduct a full-blown evidentiary hearing in every instance in which an outside influence is brought to bear upon a petit jury. . . . The court is not required to conduct an investigation into claims of exposure that are merely speculative." (internal citation omitted)).

[93] *United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994) (per curiam).

No. 09-20877

28(a)(9)(A) requires that Fleming's arguments must identify her "contentions and the reasons for them, with citations to the authorities and parts of the record on which [she] relies."[94]  In her lengthy brief to this court, many of the legal authorities cited by Fleming are unrelated to her claims of error.  Fleming's citations to the record, moreover, are sparse and often incorrect.  In many of her argument sections, she provides no citation whatsoever to the record.  We have consistently recognized that when an appellant fails to provide "the reasons [s]he deserves the requested relief with citation to the authorities, statutes and parts of the record relied on," that failure constitutes waiver.[95]

Accordingly, we conclude that Fleming has waived the following claims: that (1) the confrontation clause was violated; (2) the district court was required to provide her with a mental health expert pursuant to *Ake v. Oklahoma*;[96] (3) the district court erred when it denied her motion for discovery on selective prosecution; (4) Ibarra's allegedly perjured testimony violated her due process rights; (5) the Government interfered with the appearance of her witnesses; (6) she was prejudiced by the spillover effect of Ebhamen's perjured testimony; (7) the district court erred when it denied her motion to suppress evidence; (8) restitution is barred by claim and issue preclusion; (9) the district court erred in not analyzing forfeiture under 18 U.S.C. § 983(g); (10) the district court erred in increasing her criminal-history score based on convictions for which she was on probation; and (11) the district court erred when it denied her motion for a mistrial based on the Government's violation of FED. R. EVID. 615.

---

[94] *See also id.* (citing former version of FED. R. APP. P. 28).

[95] *Turner v. Quarterman*, 481 F.3d 292, 295 n.1 (5th Cir. 2007) (quoting *Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir. 2005)).

[96] 470 U.S. 68 (1985).

No. 09-20877

**E**

We have examined the following issues raised by Fleming and conclude they are so lacking in merit as to not warrant discussion: that (1) she did not knowingly and intelligently waive her right to counsel; (2) the district court erred when it denied her motions pursuant to FED. R. CIV. P. 60; (3) the district court did not have jurisdiction; (4) Fleming received ineffective assistance of counsel; (5) the district court erred in denying her motions for a new trial; (6) her indictment should have been dismissed due to prosecutorial misconduct; (7) evidence of the Medicare telephone hearing was not relevant and therefore inadmissible; (8) the district court erred when it denied her motion to dismiss the indictment pursuant to the Speedy Trial Act; (9) there was a material variance between the indictment and proof offered at trial; (10) the district court, and not the jury, decided the amount of restitution owed; (11) Fleming should have received a two-point reduction on her criminal history for acceptance of responsibility; (12) the jury should have determined forfeiture; (13) the district court erred when it denied her motion for additional discovery; and (14) evidence was admitted in violation of FED. R. EVID. 404(b).

**F**

Fleming contends reversal is required due to cumulative error. "Having determined above that none of [her] claims warrant reversal individually, we decline to employ the unusual remedy of reversing for cumulative error."[97] Fleming has not demonstrated any errors "so fatally infect[ing] the trial that they violated the trial's fundamental fairness."[98]

---

[97] *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007).

[98] *Id.* (internal quotation marks and citation omitted).

**X**

Fleming filed a supplemental brief in this court eleven months after submitting her initial brief. In addition to her claim, addressed above, that *United States v. Isiwele*[99] applies to her case, Fleming also contends that (1) she did not receive billing records supporting summary charts advanced at trial; (2) *United States v. Santos*[100] and *Garland v. Roy*[101] apply to her money laundering convictions; and (3) *Skilling v. United States*[102] and *United States v. Hoeffner*[103] apply to her case. "Although we have elected to consider issues raised for the first time in a supplemental brief where there has been an intervening court decision, we have done so where the decision provided an important clarification in the law, and refusal to do so would have resulted in perpetuating incorrect law."[104] Absent such circumstances, issues not raised in an opening brief are generally considered waived.[105]

Here, Fleming's billing records claim does not pertain to an intervening change in law and is therefore waived. While *Skilling* and *Hoeffner* were decided after Fleming filed her initial brief, they pertain to issues completely inapposite to Fleming's convictions. *Garland,* which was also decided after

---

[99] 635 F.3d 196 (5th Cir. 2011).

[100] 553 U.S. 507 (2008).

[101] 615 F.3d 391 (5th Cir. 2010).

[102] 130 S. Ct. 2896 (2010).

[103] 626 F.3d 857 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 2465 (2011).

[104] *Am. Int'l Specialty Lines Ins. Co. v. Res-Care, Inc.*, 529 F.3d 649, 661 n.28 (5th Cir. 2008).

[105] *Id.* ("[I]ssues not raised in opening brief are generally considered waived." (citation omitted)); *see also United States v. Pompa*, 434 F.3d 800, 806 n.4 (5th Cir. 2005) ("Neither of the Pompas addressed the sufficiency-of-the-evidence argument in their opening briefs, instead filing supplemental briefs on the subject. Any issue not raised in an appellant's opening brief is deemed waived.").

No. 09-20877

Fleming filed her initial brief, merely applied *Santos*, which was decided long before Fleming filed her initial brief. Accordingly, Fleming's argument based on *Garland* and *Santos* fails.

* * *

For the foregoing reasons, the defendants' convictions and sentences are AFFIRMED.