**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 9, 2012

Lyle W. Cayce
Clerk

No. 10-20505

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

PAULA WHITFIELD

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
4:09-CR-423-4

Before DAVIS, OWEN, and SOUTHWICK, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[*]

After a jury trial, Appellant Paula Whitfield was convicted of one count of aiding and abetting health care fraud, in violation of 18 U.S.C. § 1347, and one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. She appeals her convictions, claiming insufficiency of the evidence. For the following reasons, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-20505

### I.

Whitfield and her codefendants Ezechukwu J. Ohaka ("Ohaka") and Helen Ehi Etinfoh ("Etinfoh") were each charged with one count of conspiracy to commit health care fraud, and, in various combinations, with substantive counts of aiding and abetting health care fraud. Whitfield was charged in only one of the substantive counts, Count 5, for the filing of a fraudulent Medicare claim on behalf of Mr. Tommy Lee Reese, Jr. Whitfield and Etinfoh were convicted on all counts. Ohaka was a fugitive at the time of trial.

Ohaka owned and operated several companies that supplied durable medical equipment (DME) such as power wheelchairs and scooters to Medicare and Medicaid beneficiaries. Following Hurricane Katrina, the Medicare regulations were changed by the addition of the "CR Modifier." The CR Modifier allowed a DME supplier to replace DME that had been damaged or lost in a covered hurricane without providing all of the usual documentation when, due to the hurricane, it was unable to obtain that documentation. The CR Modifier did not eliminate Medicare's eligibility requirements, including that the equipment had to be prescribed by a doctor and medically necessary. Power wheelchairs and scooters were not considered medically necessary if the beneficiary could participate in normal daily living activities with the use of a walker or cane. The modifier also did not waive certain other regulations, including that beneficiaries had to pay a 20% copay for all equipment, that it was therefore illegal for a DME supply company to advertise free equipment, that beneficiary recruiters could not be paid by commission, and that beneficiaries had to sign their application forms. Moreover, even under the CR modifier, the DME supplier had to proceed in "good faith," defined as complying as fully as possible with Medicare guidelines and obtaining, to the extent possible, some documentation reflecting that the beneficiary had previously had

No. 10-20505

the medical equipment, and that the equipment and missing documentation were destroyed in a covered hurricane.

The Government proceeded on a theory that Ohaka owned several DME companies, including OptiMed, MedLinks Holdings, Vitacare, and, later, Luant & Odera, Inc. (Luant), that he used to commit Medicare fraud. According to the Government's evidence, Ohaka would found or purchase a company and use it to bill Medicare for DME supplies for which beneficiaries were not eligible; generally, either beneficiaries did not receive the DME, or the amount reimbursed was for more expensive equipment than the company actually purchased and delivered. When one of Ohaka's companies raised suspicions and came under investigation, the Government argued Ohaka would found or purchase a new company and use it to continue the fraud. Luant was Ohaka's most recent company, and fraudulent claims filed by Luant under the CR Modifier underlie this indictment.

Whitfield began working for Ohaka as early as the fall of 2007. Her job was to recruit Medicare beneficiaries. She gathered beneficiary information on application forms she provided to Ohaka's company. The company would use that information to create a claim form it submitted to Medicare. Whitfield was the sales representative for many fraudulent claims submitted by Ohaka's companies.

After a five day jury trial, Whitfield was convicted on both counts. She moved for a judgment of acquittal at the close of the Government's case at the end of the trial, which the trial judge denied. She timely appealed. She challenges the sufficiency of the evidence to support her convictions. She does not challenge her below-guidelines sentence.[1]

---

[1] The district court varied downward from the guidelines range of 33 to 41 months to impose a sentence of 21 months imprisonment followed by three years of supervised release, with a restitution assessment of $807,781.21.

No. 10-20505

## II.

This Court's standard of review for these charges was recently stated in *United States v. Grant*, as follows:

> The court will "view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict," to determine whether "a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009). The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt," in order to be sufficient. *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999). However, the government "must do more than pile inference upon inference upon which to base a conspiracy charge." *United States v. Mackay*, 33 F.3d 489, 493 (5th Cir. 1994) (internal quotation marks omitted).

— F.3d —, 2012 WL 2054936, at *2 (5th Cir. 2012).

## III.

On the substantive count, Whitfield was charged with aiding and abetting health care fraud. To prove health care fraud, the Government had to show that (1) Whitfield knowingly and willfully executed, or attempted to execute, a scheme or artifice (a) to defraud any health care benefit program or (b) to obtain by false or fraudulent pretenses, representations, or promises any money or property owned by or under the custody or control of a health care benefit program; and (2) the scheme or artifice was in connection with the delivery of or payment for health care benefits, items, or services. 18 U.S.C. § 1347(a);[2] see

---

[2] In pertinent part, 18 U.S.C. § 1347 reads as follows:
Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice-
      (1) to defraud any health care benefit program; or
      (2) to obtain, by means of false or fraudulent pretenses, representations,

also *United States v. Arthur*, 432 Fed.Appx. 414, 418 (5th Cir. 2011); *United States v. Hickman*, 331 F.3d 439, 445 (5th Cir. 2003). The Government can establish an intent to defraud by direct or circumstantial evidence. *United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996) (conspiracy to commit wire fraud); *United States v. Garcia*, 432 Fed.Appx. 318, 322 (5th Cir. 2011). A defendant need not have actual knowledge of the health care fraud statute or specific intent to commit a violation of it. § 1347(b).

To prove a conspiracy to commit health care fraud, the government had to show that (1) two or more persons made an agreement to commit health care fraud; (2) that Whitfield knew the unlawful purpose of the agreement; and (3) that Whitfield joined in the agreement willfully, that is, with the intent to further the unlawful purpose. 18 U.S.C. §§ 1347, 1349; *United States v. Delgado*, 668 F.3d 219, 226 (5th Cir. 2012). The agreement between conspirators may be silent and need not be formal or spoken. *United States v. Williams-Hendricks*, 805 F.2d 496, 502 (5th Cir. 1986). "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009) (internal citations and quotation marks omitted); see also *Grant*, 2012 WL 2054936, at *2.

Whitfield does not dispute that the Government proved that Ohaka, through his companies, was engaged in a scheme to defraud Medicare. The Government also clearly established that Whitfield furthered this scheme by soliciting potential beneficiaries and gathering information from them which she

---

or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned....

provided to Ohaka's companies to demonstrate their entitlement to reimbursement from Medicare, and that Ohaka's companies used this information to submit fraudulent Medicare claims.

Whitfield challenges her convictions based on a claim of ignorance of a scheme to commit Medicare fraud. Both counts required the Government to prove that Whitfield acted with knowledge and intent; it had to show that Whitfield knew Ohaka's companies were engaged in Medicare fraud, and that she knew and intended to further this fraud through her actions. She argues the Government's evidence was insufficient to sustain its burden on this element. She claims she did not know about the fraud, because the fraud was confined to the back office and she had no involvement with submitting Medicare claims or billing. She claims she gathered beneficiary information and submitted application forms in good faith, and she neither knew nor intended that this information would be used to create fraudulent claims.

The Government charged Whitfield with one substantive count, for aiding and abetting the fraudulent submission of a claim for reimbursement for a power wheelchair purchased for Mr. Reese.

The main evidence on this point was the testimony of Mr. Reese. Reese walked into court unaided. He said he is ambulatory, though he usually uses a walking stick. Reese testified that Whitfield came to his home and asked whether he would like a new, free scooter. Reese said that he had a scooter at the time that Whitfield judged to be "about wore out" and which she offered to replace. He said the old scooter had been prescribed to him by his former doctor five or six years before when he almost lost his leg due to diabetes. However, he said his new doctor – his doctor at the time Whitfield visited him – refused to prescribe him a new one, and he informed Whitfield of this. Reese testified that Whitfield told him she had contacted his doctor who had agreed he could have a new scooter, and that she had informed his doctor she was getting him one.

No. 10-20505

When the new scooter did not arrive, Reese said he checked with his doctor, and his doctor told him he never authorized a new chair for Reese. Reese also testified that his old wheelchair and scooter had been damaged in a hurricane, but that he is a retired mechanic and had successfully repaired them on his own. Finally, he testified that Whitfield asked him to go with her around his neighborhood to introduce her to potential customers. He testified that on more than one of these trips he confronted her about why his scooter had not yet arrived. He said she repeatedly reassured him it was on its way. Reese never indicated that he spoke with any representative of Luant other than Whitfield.

Though Luant billed Medicare $5,000 for a wheelchair for Reese and received $3,218.96 in reimbursement, Reese never received a chair from Luant.

Reese's testimony about his old scooter still being operational was corroborated by state Medicaid fraud investigator Russell Bliese, who testified that he visited Reese twice at his home in April of 2009, approximately 6 months after Whitfield visited him. Bliese testified that he saw an old electric scooter outside the home that he estimated to be between 5 and 10 years old. He said he tested the scooter and it was still operational, and it did not appear to have suffered any water damage. He also observed a manual wheelchair inside Reese's home. Bliese testified that Reese told him Whitfield had approached him and offered him a free wheelchair or scooter, but that he had never received it.

In her own testimony, Whitfield acknowledged that she knew about many of Medicare's eligibility requirements, including that DME supplies had to be "medically necessary," that they had to be prescribed by beneficiaries' current physicians, and that, in the case of Mr. Reese, the CR Modifier required that his previous chair be inoperable because it had been damaged by a covered hurricane.

Whitfield's educational background and experience in the healthcare industry also support the jury's implicit rejection of Whitfield's "ignorance"

No. 10-20505

defense. The prosecution established through Whitfield's testimony the facts pertinent to her education and experience. Whitfield studied biology for two years at Texas A&M and received her B.S. in information systems technology from the University of Houston. In 2006, prior to working for Ohaka, she sold Medicare advantage plans, a form of health insurance. In her testimony, she agreed that "to sell the plan, [she] had to be familiar with the regulations or what the plan provided to explain it to the people that [she was] selling it to." She also had worked in the home health care industry, marketing home health services to doctors' offices and nursing homes. She agreed that "to market the services, [she had] to understand who was eligible" to receive Medicare benefits. Whitfield had also worked for two other DME supply companies. First, in 2006, Whitfield contracted to work with the Reese Group[3] to recruit Medicare beneficiaries, essentially the same work she would later perform for Ohaka's companies. Second, on April 3, 2007 – about a year prior to most of the events here – Whitfield founded her own medical supply company. She denied that this company ever became active.

Based on Whitfield's admissions, the jury was entitled to find that Whitfield knew Medicare's eligibility requirements and the requirements of the CR Modifier. Based on Reese's testimony, the jury was entitled to conclude that Reese did not meet these requirements, and that Whitfield knew this when she submitted his application for the equipment. Despite this knowledge, Whitfield did not include any of this disqualifying information on the application form she submitted for Reese's equipment.

The Government also introduced Rule 404(b) evidence reflecting Whitfield's knowledge and intent. This evidence included the testimony of two other beneficiaries, Filma Jean Fagan and James Davis, whom Whitfield had

---

[3] There is no connection between this company and the Reese on whose behalf the fraudulent claim was filed here.

recruited and on whose behalf Luant had filed fraudulent claims.[4]  These individuals told essentially the same story as Mr. Reese.  They said Whitfield approached them uninvited and offered them a free scooter.  Neither was medically eligible for a scooter because they were both ambulatory, and they both testified that they never told Whitfield their present doctors had prescribed the equipment.  They also testified that they had previously had scooters that had been lost or damaged, but not in a hurricane, and that they never represented to Whitfield that their scooters had been damaged in a hurricane.  They also never indicated they talked to anybody other than Whitfield once their application was submitted.

Finally, the Government submitted bank records for Ohaka's companies showing that Whitfield received checks totaling $43,064.20 from them.[5]  The checks indicated they were for "medical services," "delivery services," or "medical equipment delivery," all activities Whitfield admitted she was not engaged in.  While Whitfield claimed she thought she was only working for one of Ohaka's companies – Vitacare – and had never heard of Luant, her last two paychecks were issued by Luant.

From this evidence, the jury was entitled to conclude that Whitfield's claims of ignorance of the fraudulent scheme were implausible, and that she acted to further this scheme with the necessary knowledge and intent.

---

[4] For each, Luant billed the Government $5,000 for replacement of a power wheelchair under the CR Modifier, claiming their previous equipment had been destroyed in Hurricane Ike.  Luant was ultimately paid $3,218.96 by Medicare for each chair and delivered to each a power scooter costing ~$1,040.  Luant charged neither individual the required co-pay.  Their files contained no medical documentation showing their eligibility, nor any documents showing Luant made any effort to acquire this documentation or confirm their eligibility.

[5] One of the checks Whitfield was issued bounced, so the total amount she received was slightly under $40,000.

No. 10-20505

## IV.

The evidence outlined above, when viewed in the light most favorable to the verdict, is more than adequate to sustain the jury's verdict.

AFFIRMED